[Cite as *State v. McKinney*, 2020-Ohio-3547.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                           Court of Appeals No. L-19-1033

      Appellee                                   Trial Court No. CR0201801981

v.

Nathaniel McKinney                         **DECISION AND JUDGMENT**

      Appellant                                  Decided:  June 30, 2020

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Alyssa Breyman, Assistant Prosecuting Attorney, for appellee.

Thomas P. Kurt, for appellant.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} Defendant-appellant, Nathaniel McKinney, appeals the February 8, 2019 judgment of the Lucas County Court of Common Pleas which, following a jury trial convicting appellant of rape and kidnapping, sentenced him to a total of eight years of imprisonment and classified appellant as a Tier III sexual offender.  For the reasons that follow, we affirm.

{¶ 2} Appellant was indicted on May 30, 2018, for an incident occurring on April 27, 2017, in Lucas County, Ohio. Appellant entered not guilty pleas to the charges. The matter then proceeded to a jury trial commencing on January 7, 2019.

{¶ 3} At trial, the state's main witness was the alleged victim, S.W. She testified that on April 26, 2017, she attended a cookout at the mobile home of her friend, Dillon, in Holland, Lucas County, Ohio. Also in attendance was her friend, Summer, and her date, appellant, who was introduced to S.W. by the name Goldy; she later learned his name was Nathaniel.

{¶ 4} S.W. testified that at some point in the evening she needed to leave to get more soda and water for the gathering; appellant offered to drive her and she agreed. S.W. stated that as they passed a gas station she asked appellant why he did not stop; he stated that they were going to the next store. After passing Walmart, S.W. asked appellant what was going on. According to S.W., appellant began hitting and choking her, telling her to shut up, and calling her a whore. S.W. testified that appellant had a gun.

{¶ 5} S.W. stated that appellant drove her to a two-story house, they went upstairs to a bedroom and appellant threw her on the bed, continued hitting her, and was strangling her with his hands and a chain. Appellant removed her clothing and began to vaginally rape her. S.W. stated that the assault lasted approximately two hours.

{¶ 6} Following the assault, S.W. stated that appellant would not let her have her underwear back. She put on a white t-shirt and her shorts. S.W. stated that appellant

2.

drove her back to the party and then left. S.W. told Dillon and Summer what happened and then she went home.

{¶ 7} After she arrived home, S.W. testified that she took a shower and went to her cousin's house; she and her cousin then went to the hospital. Her mother met them at the hospital. S.W. stated that the nurse asked her questions, performed a gynecological exam, and took photographs. S.W. identified appellant in the courtroom and stated that she did not consent to have sexual intercourse with him.

{¶ 8} During cross-examination, S.W. was questioned about the time frame of the events at issue. S.W. testified that she arrived at Dillon's house around 5:00-6:00 p.m., and that appellant and Summer arrived approximately one hour later. S.W. stated that she and appellant left about five hours after the group assembled. S.W. speculated that it was 8:00-9:00 p.m. She stated that they were gone approximately two to two and one-half hours.

{¶ 9} S.W. stated that multiple people saw her leave in appellant's car to get drinks; only Dillon and Summer were there when they returned. S.W. was questioned as to why she did not go straight to the hospital after the rape. She stated that she was a "mess" and was crying and just wanted to go home and take a shower which she did. S.W. testified that she called her mother and her cousin and that she and her cousin went to the police station; they directed her to the hospital to complete a rape kit.

{¶ 10} S.W. was questioned about the statements she gave to police. She stated that she first spoke with an officer about two hours after arriving at the hospital. The

3.

following day she spoke with a detective at the police station.  S.W. testified that she gave a third statement approximately one year later at the prosecutor's office.  S.W. clarified that her statements were verbal, not written.  S.W. further testified that she was presented with a photo array and that she identified appellant as the assailant.

{¶ 11} The SANE nurse who examined S.W. testified.  She stated that a sexual assault examination consists of taking a history of the incident, charting and photographing any physical injuries, and taking physical evidence from the victim, via swabs, to be sent for laboratory analysis.  The nurse stated that S.W. was tearful and upset.  The nurse testified that S.W. had injuries to her neck, mouth, and forehead, consistent with strangulation, and her arm, thighs, and vaginal area. The photographs taken by the nurse were admitted into evidence.

{¶ 12} Bureau of Criminal Investigation (BCI) forensic scientist, Emily Miller, testified that she received the rape kit from the Toledo Police Department containing swab samples from S.W. and from appellant.  Miller stated that she performed presumptive and confirmatory testing and no semen was identified.  The samples were then sent on for DNA analysis.  Miller stated that the fact that S.W. showered and changed clothing before the evidence was collected was relevant in that it aided in determining whether to conduct initial testing on certain samples or to just forward them for DNA analysis.

{¶ 13} Hallie Dreyer, also a forensic scientist with the BCI, testified that she performed the DNA analysis on samples from the sexual assault kit; they were compared

4.

with two known samples, appellant and S.W. Dreyer testified that she prepared two reports regarding her findings. The May 24, 2017 report did not contain findings of foreign DNA on the external swabs take from S.W.; the report was also completed prior to the submission of appellant's DNA and Dreyer indicated the notation that "additional male specific testing may be performed upon submission of a reference standard from the male individual in this instance." Thereafter, on April 2, 2018, Dreyer's second report was issued. The BCI had received appellant's DNA and, per office standard, they were then able to test any swabs taken from S.W.'s orifices against the male standard. As to the vaginal sample, Dreyer testified that neither appellant nor his paternal male relatives could be excluded as a source. The probability was listed as one in every 1,471 male individuals in the United States population. Dreyer explained that the Y-STR DNA finding is less precise than conventional DNA testing due to the limited database.

{¶ 14} Dreyer was cross-examined regarding the statistical probability of her findings. Dreyer state that the database used contained 6,822 male DNA profiles. Dreyer explained that there was a partial DNA match in one of the profiles which, compared to the general population, equaled one in 1,471. Dreyer testified that based on the database she was working with, the profile was considered rare.

{¶ 15} Toledo Police Officer Jeffrey Goetz testified that on April 27, 2017, at the University of Toledo Medical Center (UTMC), he took the initial report in the case. Officer Goetz stated that S.W.'s eyes were "puffy" like she had been crying, she was

5.

shaking and very nervous. Officer Goetz stated that he then returned to the police station, wrote out a report, and sent it to the detective bureau.

{¶ 16} During cross-examination, Officer Goetz clarified that he met with S.W. at UTMC on April 27, 2017, at 6:08 p.m., and talked with her for approximately 15 minutes. Officer Goetz stated that S.W. said that the incident took place between April 26 and April 27, in-between approximately 7:00 p.m. and 4:00 a.m. S.W. stated that she believed the house where she was taken was in the Airport Highway and Eastgate Road area in Toledo. Goetz further stated that S.W. did not mention that appellant had a gun.

{¶ 17} Toledo Police Detective Rebecca Kincaid testified that she administered a "blind" photo array meaning that she did not know anything about the case including the identity of the suspect. The array consisted of six numbered photographs; SW. circled number five. The array was admitted into evidence.

{¶ 18} Toledo Police Special Victims Unit (SVU) Detective Diana Trevino testified that she is assigned to cases involving sexual assaults of adults and children. Trevino stated that she was assigned the case on April 28, 2017, and met with S.W. on May 1. Officer Trevino stated that she took notes of the interview but that S.W. did not sign a written statement. Trevino stated that S.W. signed the photo array after identifying appellant as the suspect. Officer Trevino testified that she collected the buccal swab from appellant; he stated that he did not know the victim.

6.

{¶ 19} During cross-examination, Officer Trevino acknowledged that she did not recall whether S.W. told her that appellant had a gun. Based on S.W.'s description, she and other officers attempted to locate the house where the events took place; they were not successful. Further, Officer Trevino testified that S.W. gave her the names of the attendees at the cookout. Trevino stated that no one responded to requests for an interview. In particular, she attempted to contact Dillon, the party host. He did not respond to phone messages, mail, or a business card left on his door.

{¶ 20} At the conclusion of the state's evidence, appellant made a Crim.R. 29 motion for acquittal. The motion was denied and the defense then rested. Following deliberations, the jury found appellant guilty of rape and kidnapping. On February 8, 2019, appellant was sentenced to a consecutive eight-year sentence. This appeal followed with appellant raising three assignments of error for our review:

> I. The judgment of the trial court is against the manifest weight of the evidence.

> II. The trial court erred in imposing consecutive sentences where appellant's convictions for rape and kidnapping are allied offenses of similar import.

> III. The trial court erred in imposing consecutive prison sentences without making the findings required by Ohio Revised Code § 2929.14(C)(4) at the time of imposing sentence.

7.

{¶ 21} Appellant's first assignment of error argues that his convictions are against the weight of the evidence presented at trial. Appellant first notes the fact that S.W. failed to mention to either law enforcement or medical personnel that appellant had a gun during the incident. Next, appellant points to the fact that none of the partygoers testified. Finally, appellant takes issue with the DNA evidence which he states is "misleading" because, according to his calculations, approximately 71 males in the Toledo area could have been S.W.'s assailant.

{¶ 22} When reviewing a manifest weight claim,

> "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). *See State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220.

> Although under a manifest weight standard we consider the credibility of witnesses, we extend special deference to the jury's credibility determinations given that it is the jury that has the benefit of seeing the

8.

witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor.

*State v. Roberson*, 6th Dist. Lucas No. L-16-1131, 2017-Ohio-4339, ¶ 39, citing *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14.

{¶ 23} Regarding appellant's argument concerning alleged inconsistencies in the testimony, it is well-established that "'[a] conviction is not against the manifest weight of the evidence solely because the jury heard inconsistent testimony.'" *State v. Wade*, 8th Dist. Cuyahoga No. 90029, 2008-Ohio-4574, ¶ 38, quoting *State v. Asberry*, 10th Dist. Franklin No. 04AP-1113, 2005-Ohio-4547, ¶ 11. Although S.W.'s testimony does appear to conflict with the recollections of Officer Goetz and Detective Trevino regarding the presence of a gun, the witnesses were cross-examined as to the discrepancy and the jury had the ability to assess S.W.'s mannerisms and candor. Further the inconsistency does not impact the identification of appellant as the perpetrator of the charges at issue in this case.

{¶ 24} Appellant next points to the fact that there were no witnesses who attended the cookout to corroborate that S.W. either left with appellant or that she stated that she had been raped following her return. Testimony was presented about the efforts to locate witnesses. S.W.'s testimony regarding the events was largely uncontroverted. Further, there were documented physical injuries and DNA evidence. Thus, the fact that no witnesses came forward was not critical to the state's case.

9.

{¶ 25} Appellant's final complaint was that the DNA evidence presented was "misleading" and that the results were not statistically persuasive. During the trial, appellant's counsel thoroughly cross-examined BCI witnesses regarding the DNA testing techniques, analysis, and interpretation of results.

{¶ 26} Based on the foregoing, we find that appellant's convictions were not against the weight of the evidence presented at trial. Appellant's first assignment of error is not well-taken.

{¶ 27} Appellant's second assignment of error asserts that the court erred in imposing consecutive sentences where appellant's convictions for rape and kidnapping are allied offenses of similar import. We first note, as did the state, that the issue of merger was not raised in the trial court. "An accused's failure to raise the issue of allied offenses of similar import in the trial court forfeits all but plain error, and a forfeited error is not reversible error unless it affected the outcome of the proceeding and reversal is necessary to correct a manifest miscarriage of justice." *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 3.

{¶ 28} To determine whether kidnapping and another offense are subject to merger under R.C. 2941.25, the primary question is "'whether the restraint or movement of the victim is merely incidental to a separate underlying crime or, * * * whether it has a significance independent of the other offense.'" *State v. Dean*, 2018-Ohio-1740, 112 N.E.3d 32, ¶ 66 (6th Dist.), quoting *State v. Logan*, 60 Ohio St.2d 126, 135, 397 N.E.2d 1345 (1979). Where the restraint of the victim is prolonged, the confinement of the

10.

victim secretive, or the movement of the victim is substantial, there exists a separate animus for each offense. *Logan* at syllabus. A separate animus also exists where "the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime." *Id.*

{¶ 29} Appellant argues that under the present facts, the kidnapping was "inextricably intertwined" with the rape, that no harm arose from the alleged kidnapping, and that it is uncertain that any "alleged" kidnapping occurred any sooner than when appellant produced a gun and forced her into the house where the rape took place. We disagree.

{¶ 30} S.W. testified at trial that while riding in appellant's car, which she initially got into willingly, and after passing the second store where they could have purchased drinks, appellant began hitting and choking her and telling her to shut up. He then displayed a gun. S.W. stated that she went along because she "didn't want to die." When they arrived at the house, appellant told S.W. to go upstairs where he continued to physically assault her and then proceeded to vaginally rape her.

{¶ 31} Based on the foregoing, we find that there was separate and identifiable harm related solely to the kidnapping count. Accordingly, the court's failure to merge the counts at sentencing was neither plain error nor error. Appellant's second assignment of error is not well-taken.

{¶ 32} Appellant's third assignment of error argues that the court erred by imposing a consecutive sentence. Where the appellant challenges the trial court's

imposition of consecutive sentences, we are required to review the issue under R.C. 2953.08(G)(2)(a), and must affirm the trial court unless we clearly and convincingly find "[t]hat the record does not support the sentencing court's findings under division * * * (C)(4) of section 2929.14." *State v. Taylor*, 6th Dist. Wood No. WD-19-009, 2020-Ohio-404, ¶ 14.

{¶ 33} In support of his argument, appellant relies on a case where this court concluded that the defendant's consecutive sentence was not supported by the required statutory findings under R.C. 2929.14(C)(4). *State v. Clyde*, 6th Dist. Erie No. E-14-006, 2015-Ohio-1859. In *Clyde*, the appellant was convicted of multiple sexual offenses and ordered to serve some of the sentences consecutively. On appeal, we concluded that because the court failed to find one of the circumstances under R.C. 2929.14(C)(4)(a)-(c) in imposing consecutive sentences, the consecutive sentences were contrary to law. *Id.* at ¶ 51, citing *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 37.

{¶ 34} Recently this court, examining the Supreme Court of Ohio's holdings in *Bonnell*, and *State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, outlined a trial court's requirements in sentencing a defendant to a consecutive sentence. *State v. Gessel*, 6th Dist. Williams No. WM-19-004, 2020-Ohio-403. In *Gessel*, we stated that in sentencing a defendant to a consecutive sentence a trial court is required to make three statutory findings. *Id.* at ¶ 8, citing *Beasley* at ¶ 252; *Bonnell* at ¶ 26. The court must find (1) that consecutive sentences are necessary to protect the public or to punish the offender; (2) that consecutive sentences are not disproportionate to the

12.

seriousness of the offender's conduct and to the danger that the offender poses to the public; and (3) that R.C. 2929.14(C)(4)(a), (b), or (c) is applicable. *Id.*, citing *Beasley* at ¶ 252. These sections provide:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 35} The trial court must make the above-quoted findings at the sentencing hearing and in the sentencing entry. *Gessel* at ¶ 8, citing *Beasley* at ¶ 253. While "'a word-for-word recitation of the language of the statute is not required,' a reviewing court must be able to discern that the trial court engaged in the correct analysis and the record must contain evidence to support the trial court's findings." *Id.*, quoting *Bonnell* at ¶ 29.

{¶ 36} In the present case, at the February 6, 2019 sentencing hearing the trial court reviewed appellant's lengthy criminal history, including violent offenses, noting that he is "clearly a threat to the community." The court then found:

> [C]onsecutive sentences are necessary to protect the public from future crime or to punish the defendant and is not disproportionate to the seriousness of the defendant's conduct or danger that the defendant poses. The Court further finds defendant caused harm that is so great no single prison term for any of the offenses committed as part of any course of conduct adequately reflects the seriousness of the offender's conduct. Two, the defendant's criminal history requires consecutive sentences.

{¶ 37} The February 8, 2019 sentencing judgment entry provides:

> Being necessary to fulfill the purposes of R.C. 2929.11 and 2929.14(C)(4), consecutive sentence [sic] are necessary to protect the public from future crime or to punish the offender and are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. The court further finds the harm caused was great or unusual such that no single prison term is adequate, and the defendant's criminal history demonstrates that consecutive sentences are necessary to protect the public, therefore the sentences are ordered to be served consecutively.

14.

**{¶ 38}** Reviewing the proceedings, we conclude that the trial court made the necessary findings under R.C. 2929.14(C)(4). Specifically, the court's conclusion at the sentencing hearing that a consecutive sentence was warranted due to appellant's criminal history is supported by the court's recitation of appellant's extensive criminal history and accompanying statement that appellant poses a threat to the community. Accordingly, we find that appellant's consecutive sentence was not contrary to law and his third assignment of error is not well-taken.

**{¶ 39}** On consideration whereof, we find that appellant was not prejudiced or prevented from having a fair proceeding and the judgment of the Lucas County Court of Common Pleas is affirmed. Pursuant to App.R. 24, appellant is ordered to pay the costs of this appeal.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.          _____
                                                    JUDGE
Thomas J. Osowik, J.

                                 _____
Christine E. Mayle, J.                              JUDGE
CONCUR.

                                 _____
                                                    JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.