[Cite as *State v. Hopings*, 2022-Ohio-1532.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                           Court of Appeals No.  L-20-1075

      Appellee                                     Trial Court No.  CR0201902802

v.

Lawrence Hopings                              **<u>DECISION AND JUDGMENT</u>**

      Appellant                                     Decided:  May 6, 2022

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Alyssa Brayman, Assistant Prosecuting Attorney, for appellee.

Mark I. Jacobs and Spiros P. Cocoves, for appellant.

* * * * *

**OSOWIK, J.**

## I.      Introduction

{¶ 1} Appellant, Lawrence Hopings, appeals the March 18, 2020 judgment of the

Lucas County Court of Common Pleas convicting him of three counts of rape and three

counts of sexual battery.  For the following reasons, we affirm the trial court's judgment.

## A. Facts and Procedural Background

{¶ 2} Appellant's convictions were based on conduct which occurred between April 1, 2016 and April 30, 2017. Appellant was initially indicted in 2017. The original indictment was dismissed in 2018, without prejudice, at the state's request. Appellant was again indicted in 2019 for the same conduct. The refiled indictment ultimately proceed to trial, from which the final judgment is the subject of this appeal. Because appellant alleges errors which encompass the procedure under both the original and the refiled indictments, the following summary provides the procedural details under both case numbers.

### i. Lucas County Court of Common Pleas Case No. CR 2017-2020

{¶ 3} On June 16, 2017, appellant was indicted on three counts of rape by force or threat of force in violation of R.C. 2907.02(A)(2) and (B), each a first-degree felony; and three counts of sexual battery in violation of R.C. 2907.03(A)(5) and (B), each a third-degree felony. The charges were assigned Lucas County Court of Common Pleas case No. CR 2017-2020. Appellant was arrested that same day. Appellant was arraigned on June 19, 2017, was appointed counsel, and entered a not guilty plea to all counts. The trial court set appellant's bond in the amount of $525,000 and appellant was remanded into the custody of the Lucas County Sheriff's Department. The trial court also set appellant's trial for August 1, 2017.

2.

{¶ 4} On that date, appellant requested a continuance of the trial date. The trial court granted appellant's request and continued the trial to September 12, 2017. On the rescheduled trial date, appellant again requested a continuance which the trial court granted. The case was rescheduled for trial on November 28, 2017.

{¶ 5} The state appeared for the newly scheduled trial date and informed the trial court that the victim, L.S., was taking part in residential mental health treatment and would not be prepared to testify. Because of this, the state made its first request to continue the trial date. The trial court granted the state's request over appellant's objection. Appellant's trial was rescheduled for January 30, 2018. On that rescheduled trial date, the state informed the trial court that L.S. was still unable to testify and requested the trial court dismiss the charges, without prejudice. The trial court granted the state's request. From the time of his arrest to the dismissal of the charges, appellant was held in jail in lieu of bail for a total of 277 days.

### ii. Lucas County Court of Common Pleas Case No. CR-2019-2802

{¶ 6} The state again indicted appellant on identical charges on October 16, 2019. The refiled charges were assigned Lucas County Court of Common Pleas case No. CR 2019-2802. Appellant was arraigned on the refiled charges on October 23, 2019. He was again appointed counsel and entered a not guilty plea to all counts. The trial court set appellant's bond in the amount of $750,000 and appellant was remanded into the custody of the Lucas County Sherriff's Department. The trial court also set a pretrial for

3.

October 30, 2019. At that pretrial, appellant signed a written waiver of his speedy trial rights and consented to a rescheduled trial date of January 7, 2020.

{¶ 7} On January 6, 2020, appellant filed a motion to dismiss the charges. Appellant's motion included a letter signed by L.S., dated August 1, 2017, in which she purportedly recanted all of her allegations. The letter stated that L.S. lied about appellant's conduct as revenge for his shortcomings in their father-daughter relationship. Appellant's motion sought dismissal of all charges arguing that the letter "fully exonerates [appellant]." The state filed its opposition on January 21, 2020. The state argued that a motion to dismiss pursuant to Crim.R. 12(C) was limited to challenging the sufficiency of the indictment and could not be used to show that the state would be unable to prove the elements of the offense at trial. The trial court ultimately denied appellant's motion with an entry dated January 24, 2020, basing its decision on the grounds argued by the state.

{¶ 8} Contemporaneous with the motion practice, appellant and the state appeared for the January 7, 2020 trial date. There, appellant requested, and the trial court granted, a continuance of the trial to January 28, 2020. On that date, the state informed the trial court that L.S. had undergone a minor medical procedure and was unavailable. The state requested a continuance to February 18, 2020. Appellant did not object to the state's request and the trial court granted the continuance.

4.

{¶ 9} On the morning of appellant's February 18, 2020 trial date, the state filed a motion to amend the indictments to reflect that the conduct supporting each count occurred between April 1, 2016 and April 30, 2017. Appellant informed the trial court that it did not object to the amendment and the motion was granted the same day. Appellant then requested another continuance to investigate additional information regarding recently disclosed witnesses and the subject of their testimony. The trial court granted appellant's request and set the matter for trial on March 10, 2020—the date on which appellant's trial commenced. From the time of his arrest on the refiled charges to the commencement of trial, appellant had been held in jail in lieu of bail for a total of 146 days.

### Jury Selection and Trial Commencement

{¶ 10} A three-day trial commenced on March 10, 2020. Initially, the parties proceeded to select 12 jurors and 2 alternates from the venire. After jury selection, the proceedings were recessed for approximately one hour before opening statements were to begin.

{¶ 11} Upon returning from recess, counsel for appellant and the prosecutor met in the trial court's chambers for a discussion outside the presence of the jury. During that discussion, the prosecutor informed the trial court that as he was returning to the courtroom, an individual he believed had just been selected for the jury saw him in the hallway and asked "did [appellant] take a plea so we can all go home?" The prosecutor

believed that other members of the jury were present for the comment but stated that he needed to see the panel again before he could confirm any of their identities. The parties agreed to have the trial court's bailiff begin seating the jury in the jury box and allow the prosecutor to determine if the individual that spoke to him was indeed a member of the jury. The prosecutor confirmed that it was Juror Number 12 that had made the comment but was unable to determine if any other jurors were present at that time. The parties agreed to conduct a separate, in-chambers voir dire of Juror Number 12 to determine whether her statement impacted her ability to continue serving on the jury.

{¶ 12} During her individual voir dire, Juror Number 12 indicated that she made the comment because she thought appellant may have agreed to a plea deal which would have relieved the panel of their jury service. Regarding the nature of the statement, Juror Number 12 stated "I was just making a joke," "it was strictly a joke," and "we thought perhaps a plea had happened." When the trial court asked if she could still "sit and listen to the evidence," juror number 12 stated "[o]h, yes." After Juror Number 12 exited the chambers, appellant's counsel stated:

> Judge, given that comment and the context in which it was made, and given the fact that she was here and that I saw her, it sounds worse than it is. * * * But based upon what was said, I believe it to be a comment made out of being facetious or maybe even nervous, and I don't—I don't believe

6.

she can be anything but fair and impartial given her answers not just here in your chambers but out in the courtroom as well[.]

The trial court agreed and permitted Juror Number 12 to continue her service on the jury. The trial court also indicated that to avoid singling Juror Number 12 out in open court that the preliminary jury instructions would include an advisement that jurors were not permitted to speak with any counsel during the trial.

{¶ 13} The parties then proceeded to the courtroom for the commencement of appellant's trial at which the parties elicited the following testimony and related evidence: [1]

### Testimony of L.S.

{¶ 14} L.S. was born on October 26, 2001. At the time of the trial, she was in the custody of the Lucas County Children's Services Department ("LCCS"). Appellant is L.S.'s biological father. From the time she was born until she was 14 years old, L.S. lived with her grandmother. She did not have any contact with appellant during that time.

{¶ 15} In the Spring of 2016, at the age of 14, L.S. reached out to appellant in order to establish a father-daughter relationship. She initially contacted appellant via text messaging but began meeting him in person approximately one month later.

---

[1] For ease of reading, the summary of witness testimony is not presented in the order that the witnesses testified at trial. Testimony not relevant to appellant's arguments on appeal has been omitted.

7.

{¶ 16} L.S. testified that appellant began sexually abusing her in April of 2016. The first incident occurred while she was visiting appellant at his father's residence in Toledo, Ohio. While watching a movie, appellant sat down behind L.S. and removed her pants and underwear. He then repeatedly pulled L.S.'s head back, told her to "take it like a woman," and proceeded to have vaginal intercourse with her. L.S. was eventually able to get away from appellant who then stated "I should have never did that." The following morning, L.S. found blood in her underwear. L.S. did not report this incident to anyone.

{¶ 17} At the time of this first incident, L.S. was living with her aunt and cousin. After experiencing physical and verbal abuse there, she moved in with another aunt, M.D. Appellant was also living with M.D. at that same time. L.S. and appellant each had their own room at M.D.'s house. However, appellant soon moved into L.S.'s room with her claiming that the odor of cat urine prevented him from staying in his room. L.S. testified that while living with M.D., appellant continued to have vaginal intercourse with her "plenty of times." He also performed oral sex on L.S. and had her perform oral sex on him. L.S. testified that most often she did not resist because if she did he "would just take it." L.S. also testified that appellant would "always" tell her not to tell anyone about his conduct or he would stop talking to her and that "it won't turn out good." She also testified that when she was more forceful with her resistance that appellant would "beat on [her]."

8.

{¶ 18} L.S. later described an incident which occurred in July of 2016, at her cousin's residence. While attending a family gather, appellant had approached a table L.S. was sitting at and sat down. L.S. then sat on his lap. Before she got up, appellant told her "tonight we gonna do this." L.S. stood up to leave and appellant responded by showing her his penis. He covered himself when he heard others coming into the room. Later, while L.S. was holding a relative's baby, appellant took the baby from her, laid the baby on the couch, forced himself on top of L.S. and had vaginal intercourse with her. Appellant was interrupted when another relative came to pick up the baby who was now crying. Appellant stopped having sex with L.S. and they both quickly dressed when they heard the relative approaching.

{¶ 19} On another occasion, L.S. and appellant were again visiting his dad's residence. L.S. testified that she went upstairs to use the restroom and appellant followed her. He pulled her into a bedroom and forcibly engaged in vaginal intercourse with her. She eventually pulled herself away from him and he said "don't do this to daddy." L.S. refused to continue. She testified that she was bleeding from her vagina which she attributed to the force of the intercourse.

{¶ 20} Overall, L.S. testified that appellant had vaginal and oral sex with her on multiple occasions at five different residences between April 1, 2016 and April 1, 2017. L.S. eventually moved from M.D.'s house where she shared a room with her father to her brother's house. She subsequently contacted Kaitlin Middleton, a crisis care manager at

9.

the Zepf Mental Health Center, with whom L.S. had previously worked with following previous suicide attempts. L.S. asked Middleton to come to her brother's residence to discuss ongoing issues.

{¶ 21} During the discussion, Middleton reminded L.S. that during one of her previous hospitalizations, L.S. had allowed the Middleton to review the contents of her cell phone and iPad. This review was the result of L.S. informing Middleton that appellant had previously touched her buttocks. At that time, L.S. had not informed Middleton of any other sexual conduct between her and appellant. The contents of L.S.'s devices included a video in which appellant describes L.S. as "fine" and addresses her as his "baby mama," which L.S. interpreted as appellant's desire to impregnate her. L.S. testified that after Middleton reminded her that she had already seen the contents of her phone, she informed Middleton that appellant had, in fact, engaged in sexual contact with her over "200 times." On cross-examination she conceded that this amount was hyperbolic and exceeded the "50 to 100 times" estimate she initially reported to police in 2017.

{¶ 22} After informing Middleton of appellant's conduct, L.S. was moved into foster care through LCCS. On May 27, 2017, with Middleton's encouragement, L.S. sent a text message to appellant informing him that she had disclosed his conduct to Middleton. Appellant and L.S. engaged in a text conversation in which appellant immediately responded that he was "going to jail." Later in the exchange, appellant

10.

denied he ever had sex with L.S. and that she "better tell them [she] lied." In one exchange, L.S. told appellant that she told Middleton that she and appellant had only had sex once. During her testimony, L.S. identified this as an intentional misstatement. She testified that Middleton suggested that she not divulge the entirety of her disclosure because she was afraid of how appellant and his family would respond. A printout of the text conversations between L.S. and appellant following her reporting of appellant's conduct to Middleton was admitted into evidence as State's Exhibit 5.

{¶ 23} During her testimony, L.S. was presented with her August 1, 2017 letter in which she recanted her allegations against appellant. In the letter, L.S. stated that her allegations were revenge for what she perceived as appellant's failures as a father. L.S. testified that the letter itself was false and that she felt pressured to recant her story because of how appellant and his family and friends responded to her allegations and anticipated testimony.

{¶ 24} Finally, L.S. testified that when appellant's initial trial had been scheduled for January 30, 2018 (case No. CR 2017-2020), she was receiving inpatient treatment at a mental health facility and was unable to testify. In 2019, after completing her treatment, L.S. contacted Detective Michael Taulton of the Toledo Police Department regarding her allegations. Detective Taulton had originally interviewed L.S. in relation to appellant's conduct. Detective Taulton again interviewed L.S. prior to the charges being refiled. She informed Detective Taulton that she had decided to testify against appellant because she

11.

believed it was "time to get the truth out" about his conduct. L.S. concluded her testimony by stating there were "at least" 14 different locations where appellant engaged in sexual conduct with her.

**Testimony of Kaitlin Middleton**

{¶ 25} At all times relevant to this case, Kaitlin Middleton worked as a crisis care manager at the Zepf Mental Health Center in Toledo, Ohio. Her work at the center involved meeting with juvenile clients that had recently been released from hospital treatment for their suicidal or homicidal ideations. Middleton would meet with the clients to monitor their symptoms and behaviors, ensure they received their medication and attended therapy appointments, and help establish additional treatment options if necessary.

{¶ 26} Middleton first met L.S. in her capacity as a crisis care manager on February 14, 2017. L.S. had previously been hospitalized for mental health treatment after exhibiting suicidal ideations. Middleton met with L.S. to develop a crisis plan following her recent release from treatment. Middleton continued to meet with L.S. at appellant's residence twice a week. During that time, Middleton informed appellant that it was important for him to be involved in L.S.'s treatment by monitoring her closely. Middleton also noted that appellant would not leave L.S. alone with her at any time during their visits. Middleton testified that this was suggestive of an abusive relationship because it was "unusual" for a parent to insist on being involved in these sessions. She

12.

conceded, however, that a lack of involvement by appellant would have also been concerning.

{¶ 27} At one of her later visits, L.S. reported that appellant was sexually abusing her. Middleton was obligated by law to report this abuse to LCCS. After making the report, Middleton arranged hospitalization treatment for L.S. who had informed Middleton that she felt unsafe with appellant and was exhibiting behavior that indicated she might harm herself. Middleton arranged L.S.'s admission to the University of Toledo's Kobacker mental health facility in Toledo, Ohio.

### Testimony of Detective Michael Taulton

{¶ 28} Detective Michael Taulton had been a member of the Toledo Police Department for 23 years at the time of appellant's trial. At that time, he worked as an investigator for the Special Victims Unit ("SVU") and was tasked with investigating sexual crimes. He testified that the SVU exists because sexual crimes are particularly sensitive and their investigation requires specialized training. Specifically, he was trained to conduct "forensic interviews" with children who alleged that they have been the victim of sexual abuse. In contrast to interviewing an adult, in which the questions are designed to elicit affirmative admissions and denials, a forensic interview of a child involves asking open-ended questions with narrative responses. Detective Taulton stated that this method was preferred because children often simply agree with the interviewer if asked questions which suggest a certain response rather than providing an honest answer.

13.

{¶ 29} Detective Taulton also noted that in his experience, child victims of sexual abuse may delay reporting abuse because they fear abuse from other family members or an escalation of the abuse which is already occurring. He noted his observation that this was common in intra-family abuse cases. He also testified that children sometimes recant their allegations for various reasons other than that they were false. These reasons include the resulting disruption in their household activities, pressure from others in the family, and confusion about being abused by loved ones.

{¶ 30} As to his investigation in appellant's case, Detective Taulton testified that he conducted a forensic interview with L.S. both in 2017 and 2019 regarding her allegations. He noted that despite L.S.'s testimony that appellant had had sex with her over 200 times that she had initially reported that it occurred 50 to 100 times. After his interview with L.S., Taulton conducted a data extraction of cell phones belonging to L.S. and appellant as well as L.S.'s iPad. He confirmed that State's Exhibit 5, which included the text messages L.S. described during her testimony, was a report derived from these extractions.

{¶ 31} Detective Taulton further testified that when he interviewed appellant that appellant denied all of L.S.'s allegations. Detective Taulton stated that this was a common response when he interviewed an individual accused of sexual abuse. He conceded during cross-examination, however, that he had heard similar denials during his

14.

previous investigations of property theft cases and that such a denial was not exclusive to sexual abuse cases.

{¶ 32} Finally, Taulton testified that based on his interviews and his review of the data extracted from the parties' devices, he believed a criminal offense had occurred and referred the matter to the state for prosecution.

### Testimony of L.G. and M.D

{¶ 33} Appellant called two witnesses—L.G. and M.D., appellant's aunts—during his case-in-chief. Each of these witnesses testified that they resided with appellant and L.S. at some point during the times relevant to this case. Each testified that they did not observe appellant engaging in any inappropriate conduct with L.S. and that the living space provided allowed for L.S. and appellant to have their own rooms. Both L.G. and M.D. conceded that they did not observe appellant and L.S. at all times and that L.S.'s allegations regarding appellant's conduct could have occurred during those unobserved times.

### Jury Verdict, and Sentencing

{¶ 34} Following closing arguments and the recitation of jury instructions, the matter was submitted to the jury for deliberations. The jury returned a guilty verdict on all six counts. The trial court set a sentencing hearing for March 18, 2021.

{¶ 35} At sentencing, the trial court imposed a mandatory prison term of 11 years for each of appellant's three rape convictions. The trial court also imposed a 60-month

15.

prison term for each of appellant's sexual battery convictions. The trial court ordered appellant to serve all six prison terms consecutively for an aggregate prison term of 48 years. Appellant's sentence was memorialized in a judgment entry dated March 18, 2020.

## B. Assignments of Error

{¶ 36} Appellant timely appealed and asserts the following errors for our review:

1. Trial counsel for the Defendant, Appellant herein, was ineffective and did not achieve or provide the minimum constitutionally mandated standard for representation of the Defendant at the trial of this cause;

2. Failure to contest seating juror who made comment to the prosecutor indicating favor for Defendant taking a plea during jury selection;

3. Appellant is entitled to have this case dismissed and to be released due to the violation of his speedy trial rights, pursuant to the United States and Ohio Constitutions; and

4. The convictions for rape and sexual battery are offenses of similar import and the jury did not identify the "separate" nature of the offenses for which the Appellant stands convicted.

Appellant's second assignment of error alleges a specific instance of ineffective assistance of counsel. His first assignment of error alleges that cumulative errors,

16.

including the error alleged in the second assignment, resulted in ineffective assistance of counsel. For purposes of clarity, we address these assignments in reverse order.

## II.     Law and Analysis

### A. Trial counsel's consent to Juror Number 12's continued service on the jury did not constitute ineffective assistance of counsel.

{¶ 37} In his second assignment of error, appellant argues that his trial counsel's consent to Juror Number 12's continued service on the jury despite her alleged bias against him constituted ineffective assistance of counsel. In order to prevail on a claim of ineffective assistance of counsel, an appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court proceedings cannot be relied on as having produced a just result. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). An appellant must show "(1) deficient performance of counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland* at 687–688. Appellant does not meet this burden as to his second assignment of error.

{¶ 38} Appellant argues that a singular decision made by trial counsel—that is, the failure to object to Juror Number 12's service on the jury—rendered his counsel's assistance ineffective. Essentially, appellant argues that because Juror Number 12 had

17.

commented that a plea deal would have allowed her and the rest of the jury to "go home" that she was biased against appellant. Appellant argues that he suffered prejudice as a result of trial counsel's failure to investigate that bias or ask for her removal from the jury. We disagree.

{¶ 39} Generally, the determination as to whether to challenge a juror is a matter of "trial strategy" which Ohio courts have "consistently declined to 'second guess' * * * or impose 'hindsight views about how current counsel might have voir dired the jury differently.'" *State v. Mundt,* 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 63. "Few decisions at trial are as subjective or prone to individual attorney strategy as juror voir dire, where decisions are often made on the basis of intangible factors." *Id.* at ¶ 64, citing *Miller v. Francis,* 269 F.3d 609, 620 (6th Cir., 2001). "[C]ounsel is in the best position to determine whether any potential juror should be questioned and to what extent." *Id.*, citing *State v. Murphy,* 91 Ohio St.3d 516, 539, 747 N.E.2d 765 (2001).

{¶ 40} Our review of the record, including juror number 12's responses during the initial voir dire and her responses to questions in chambers, reveals no evidence that appellant's trial counsel's desire to keep her on the jury fell below an objective standard of reasonable representation. Juror Number 12 stated that she could be fair and reasonable despite her statement to the prosecutor. Appellant's counsel, who was in the best position to determine whether Juror Number 12's service on the jury would benefit appellant, explicitly stated that he had considered all of Juror Number 12's responses

18.

during voir dire in determining that she could remain fair and impartial despite her allegedly biased remark. We find nothing in the record to suggest that trial counsel's decision was anything more than trial strategy. Therefore, appellant has not established that his counsel's performance was deficient.

{¶ 41} Appellant likewise fails to show that Juror Number 12's service on the jury resulted in prejudice. "When a defendant bases an ineffective assistance claim on an assertion that his counsel allowed the impanelment of a biased juror, the defendant 'must show that the juror was actually biased against [them].'" *Id.* at ¶ 67, citing *Miller* at 620. "'Actual bias is bias in fact'—the existence of a state of mind that leads to an inference that the person will not act with entire impartiality.'" *State v. Bates,* 159 Ohio St.3d 156, 2020-Ohio-634, 149 N.E.3d 475, ¶ 25. Impartiality may be shown through the juror's own statements. *State v. Herring,* 94 Ohio St.3d 246, 259, 762 N.E.2d 940 (2002) (holding that "[a] trial court may rely on a juror's testimony as a basis for finding that [their] impartiality was not affected").

{¶ 42} Although appellant argues that Juror Number 12 was biased against him, the record does not support that claim. A fair reading of juror number 12's remark indicates that she sought to avoid jury service generally, not that she had prejudged appellant's guilt. During the in-chambers voir dire, the trial court noted that during general voir dire, only one potential juror—not Juror Number 12—raised their hand when asked if they were excited to have received the jury summons. While recognizing that it

19.

was not always convenient, the trial court impressed upon Juror Number 12 the importance of jury service. Juror Number 12 responded that she understood her responsibility and that her remark regarding ending that service early did not impact her ability to judge appellant's guilt or innocence based on the evidence presented. Based on Juror Number 12's own statements, we find that there is nothing in the record to suggest that Juror Number 12 was biased against appellant or that he suffered any prejudice as a result of her participation on the jury. As a result, we find appellant's second assignment of error not well-taken.

### B. Trial Counsel's alleged individual instances of ineffective assistance do not establish cumulative error warranting reversal of appellant's conviction.

{¶ 43} In his first assignment of error, appellant argues that cumulative errors made by his trial counsel rendered counsel's assistance ineffective. Appellant prefaces his claim by stating that "[w]hile it is arguable that no single shortcoming or specific incident is enough to rise to the level of and to, in itself, standing alone, demonstrate the lack of minimally constitutional effectiveness to which [appellant] is entitled, the aggregate actions and inactions of all of trial counsel's shortcomings create a cumulative effect that renders the representation of [appellant] constitutionally ineffective in the trial court." Appellant then lists several alleged errors made by trial counsel to support his claim that he received ineffective assistance.

20.

{¶ 44} The Ohio Supreme Court previously recognized that the doctrine of cumulative error may be applied to a claim of ineffective assistance of counsel. *State v. DeMarco,* 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987). "Under this doctrine, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous errors does not individually constitute cause for reversal." *State v. Graham,* 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841 ¶ 169. As applied to a claim for ineffective assistance of counsel, "[e]ach assertion of ineffective assistance of counsel going to cumulative error depends on the merits of each individual claim; when none of the individual claims of ineffective assistance of counsel have merit, cumulative error cannot be established simply by joining those meritless claims together." *Id.* at 170, citing *State v. Hill,* 75 Ohio St.3d 195, 661 N.E.2d 1068 (1996). Because each of appellant's individual claims of ineffective assistance of counsel are without merit, we find that he has failed to show cumulative error sufficient to reverse his conviction. We address each of the alleged instances of ineffective assistance in turn:[2]

---

[2] Appellant must satisfy both prongs of the *Strickland* test in order to succeed on a claim alleging ineffective assistance of trial counsel. Because we find that appellant failed to show he suffered prejudice as a result of trial counsel's representation, we need not address whether the alleged errors in assignment of error number 2 fell below an objective standard of reasonable representation. *Hale* at ¶ 204.

21.

### 1. Motion to dismiss

{¶ 45} Appellant first argues that trial counsel's "simplistic" motion to dismiss supports his claim that trial counsel was ineffective. The motion to dismiss consisted of a single paragraph which argued that L.S.'s 2017 letter recanting her allegations showed that appellant had been "exonerated" and should have resulted in dismissal of all charges. Appellant identifies trial counsel's failure to include any additional information, or citation to any case authority which would have otherwise supported the motion, as an example of his deficient representation. Appellant fails, however, to identify any prejudice he suffered as a result of the allegedly deficient motion.

{¶ 46} A Crim.R. 12(C) motion to dismiss "can only raise matters that are capable of determination without a trial on the general issue." *State v. Owens,* 2017-Ohio-2909, 91 N.E.3d 103, ¶ 13 (6th Dist.). The trial court denied appellant's motion recognizing that whether L.S.'s letter precluded the state from proving all elements of the indicted offenses could only be determined at trial. In his brief, appellant simply argues that the motion was deficient. He does not, however, provide any basis on which a properly supported motion would have resulted in the dismissal of the charges. Because appellant does not identify the information trial counsel omitted from its "minimalist" motion that would have warranted dismissal of the charges, he fails to show that the results would have been different and that he suffered prejudice as a result. *Hale*, 119 Ohio St.3d 118,

22.

2008-Ohio-3426, 892 N.E.2d 864 at ¶ 204. Therefore, trial counsel's conduct in filing the motion to dismiss does not support a claim for ineffective assistance of counsel.

### 2. Failure to Request Bill of Particulars

{¶ 47} Appellant argues that trial counsel should have requested a bill of particulars, pursuant to Crim.R. 7(E), to identify "the dates, times, locations, witnesses, or other details concerning the alleged actions[.]" Appellant states that "determining how a Bill of Particulars was not requested is impossible to explain, but for counsel's ineffectiveness." Appellant's conclusory argument, however, is insufficient to show that he suffered prejudice as a result of trial counsel's conduct. Appellant offers no argument about how having the information contained in a detailed bill of particulars would have impacted his defense. As noted by the state, appellant's defense was to challenge L.S.'s credibility—that is, to create a reasonable doubt as to whether the charged conduct ever occurred. A bill of particulars providing specific dates, times, and locations at which the conduct occurred is irrelevant to that defense. It is unclear, then, how any additional information contained in a bill of particulars would allow appellant to show a reasonable probability that the proceeding's results would have been different. As a result, appellant has not shown that he suffered prejudice as a result of trial counsel's failure to request the bill of particulars.

23.

### 3. Failure to properly question potential jurors

{¶ 48} Appellant argues that trial counsel's failure to object to the dismissal for cause of a disabled member of the venire, and the failure to question other jurors that may have overheard Juror Number 12's remark regarding a plea agreement, resulted in ineffective representation. Again, appellant merely argues that trial counsel should have made a more significant inquiry of certain members of the venire during voir dire. He makes no argument showing what questions counsel could have asked that would have either shown the disabled juror should not have been dismissed or that the jurors who may have heard Juror Number 12's remark would have exhibited bias toward him. Therefore, appellant has not shown that the proceeding's results would have been different had his counsel conducted a more comprehensive voir dire. The lack of identified prejudice resulting from trial counsel's decision precludes a finding of ineffective assistance of counsel based on counsel's allegedly deficient performance during jury selection.

### 4. Lack of preparation in cross-examining witnesses

{¶ 49} Appellant next challenges trial counsel's failure to properly cross-examine Kaitlin Middleton and Detective Taulton. Specifically, he argues that trial counsel should have obtained Middleton's discoverable records of her interactions with L.S. and used them to prepare for her cross-examination. Appellant concludes that "[g]iven the list of other items that the defense counsel missed, ignored, or glossed over, in evaluating his

24.

constitutional effectiveness, this should be considered." Appellant offers no argument, however, as to what these records would have revealed or how they could have been utilized at trial to procure a different result.

{¶ 50} With regard to Detective Taulton's testimony, appellant argues that trial counsel should have objected to Taulton's reading of his summary of the video recovered from L.S.'s phone. This, he continues, allowed Detective Taulton to exert undue influence over the jury by providing his interpretation of the video in an "expert witness" capacity. Appellant also argues that trial counsel should have questioned Detective Taulton regarding the prevalence of false accusations in child sexual abuse cases—an assertion appellant makes without providing any support. Despite alleging these errors, appellant offers no argument as to how trial counsel's failure to conduct a more comprehensive cross-examination of Detective Taulton would have changed the proceeding's result, particularly in light of the remaining evidence against him.

{¶ 51} Put simply, while trial counsel's cross-examination of the state's witnesses could have purportedly elicited additional details, appellant offers no argument that he suffered prejudice as a result of this lack of detail.

### 5. Failure to present adequate witnesses in appellant's defense

{¶ 52} As to his own defense, appellant argues that trial counsel made "minimal effort" to investigate and present additional witnesses which might have provided a more substantive defense to the charges against him. Appellant makes absolutely no mention

of who else trial counsel might have called to testify in his defense or the subject matter of their testimony. Without this information, appellant can only make conclusory statements that his trial counsel was ineffective. These statements are insufficient to show that appellant suffered prejudice as a result of this alleged error.

### 6. Miscellaneous allegations of ineffective assistance

{¶ 53} We note that in addition to the 5 enumerated alleged instances described above, appellant also identifies a list of 33 incidents which occurred before or during his trial which he requests this court consider in resolving his first assignment of error. The list includes, among other items, actions taken by appellant himself ("Appellant has no confidence in counsel and explains that to the Court," "Appellant requests new counsel"), actions taken by the trial court ("Jury sworn in AFTER the issue with juror [number 12]," "Trial Judge states concern for Defendant's Speedy Trial rights"), assumptions regarding trial counsel's motives for certain decisions ("Counsel fails to ask prospective juror questions because she is disabled," "Counsel 'stipulates' to the evidence, without any indication that he has ever reviewed it"), and the identification of 14 off-the-record conversations which occurred throughout trial. Essentially, appellant has provided a list of grievances he had with the entire trial process in order to bolster his "cumulative" error argument.

{¶ 54} We find no bases on which appellant's own conduct or actions taken by the trial court could be imputed to trial counsel in support of a claim for ineffective

26.

assistance. Moreover, there is nothing in the brief, or in the record, which correlates the listed conduct attributable to trial counsel with whether trial counsel's assistance fell below an objective standard of reasonable representation or resulted in prejudice. Appellant merely states that this list reflects a general "substandard effort by trial counsel." General averments that the prejudice suffered is "clear" and "obvious" cannot "act as a substitute for an actual showing of prejudice." *State v. Palmer,* 80 Ohio St.3d 543, 555, 687 N.E.2d 543 (1997). As a result, we find that appellant fails to show that any of these miscellaneous allegations satisfy either element of his claim for ineffective assistance of counsel.

{¶ 55} In sum, appellant fails to show that any of his individual claims of ineffective assistance of counsel have merit. Since cumulative error cannot be established simply by joining meritless claims together, appellant has failed to establish the he received ineffective assistance of trial counsel. *State v. Graham,* 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841 at ¶ 170. For these reasons, we find appellant's first assignment of error not well-taken.

### C. Appellant's speedy trial rights were not violated

{¶ 56} In his third assignment of error, appellant argues that the state violated his right to a speedy trial when it failed to commence his trial within the time period

provided in R.C. 2945.71.[3] R.C. 2945.71(C)(2) requires any person against whom a felony charge is pending to be "brought to trial within two hundred seventy days after the person's arrest." R.C. 2945.71(E) states that "each day during which the accused is held in jail in lieu of bail on the pending charge shall be counted as three days." When refiled charges are based on the same set of facts as originally filed and dismissed charges, the time within which the trial is to begin on the refiled charges is subject to the same statutory limitations period that is applied to the original charge. *State v. Adams,* 43 Ohio St.3d 67, 68, 538 N.E.2d 1025 (1989). That is, "the arrest of a defendant, under a reindictment which is premised on the same underlying facts alleged in a previous indictment, is the proper point at which to *resume* the running of the speedy trial period." *State v. Broughton,* 62 Ohio St.3d 253, 260, 581 N.E.2d 541 (1991) (emphasis added).

{¶ 57} While the statute provides a specific time limit in which a defendant must be brought to trial, that time may be extended under certain exceptions enumerated in R.C. 2945.72. Relevant to this appeal, the time for bringing a defendant to trial may be extended under R.C. 2945.72(H) for "the period of any continuance granted on the accused's own motion, and the period of any *reasonable* continuance granted other than upon the accused's own motion." (emphasis added). When the state requests a

---

[3] We note that Ohio recognizes both constitutional and statutory claims that a defendant's speedy trial rights have been violated. *State v. Glanton,* 6th Dist. Wood No. WD-18-091, 2020-Ohio-834, ¶ 18. Because appellant only alleges a statutory violation, we limit our analysis accordingly.

28.

continuance, the extension provision in R.C. 2945.72(H) applies only when the duration of the continuance is "reasonable" and "necessary." *State v. Crawford,* 6th Dist. Lucas No. L-17-1297, 2019-Ohio-2660, ¶ 32, citing *State v. Willis,* 6th Dist. Wood Nos. WD-15-006 and WD-15-007, 2016-Ohio-616, ¶ 17. "Whether such a continuance is reasonable and necessary depends on the facts and circumstances of the case." *Id.*, citing *State v. Saffell*, 35 Ohio St.3d 90, 91, 518 N.E.2d 934 (1988). In addition to these statutory extensions, the speedy trial time period does not run when the defendant knowingly and voluntarily waives their speedy trial rights. *State v. Blackburn,* 118 Ohio St.3d 163, 2008-Ohio-1823, 887 N.E.2d 319, ¶ 17-22.

{¶ 58} "If the defendant makes a prima facie showing that his speedy-trial time has elapsed, the burden shifts to the state to show that the defendant was timely brought to trial. *State v. Crawford,* 6th Dist. Lucas No. L-17-1297, 2019-Ohio-2660. A speedy-trial calculation, then, requires this court to "simply count the number of days passed, while determining to which party the time is chargeable, as directed in R.C 2945.71 and 2945.72." *Id.*

{¶ 59} It is undisputed that appellant was held in jail in lieu of bail for 277 days during the pendency of case No. 2017-2020. It is also undisputed that appellant was held in jail in lieu of bail for 146 days following his arrest and up to the commencement of his trial in case No. CR 2019-2802. Combined, appellant was held in jail in lieu of bail for 423 days. Because appellant was held in jail in lieu of bail, the triple counting provision

29.

in R.C. 2945.72(E) applies. The state, then, was obligated to bring appellant to trial within 90 days of his original indictment. Appellant has established a prima facie case showing that his speedy trial time elapsed as his trial did not commence until 423 days after his original indictment. We therefore must analyze what portion of the elapsed time is chargeable to appellant or to the state to determine whether appellant's speedy-trial rights have been violated.

{¶ 60} In case No. CR-2017-2020, appellant was initially held in custody for 45 days from June 17, 2017 until his scheduled August 1, 2017 trial date. As no extension or waiver applies to this time, all 45 days are chargeable to the state. On his initial trial date, appellant requested a continuance which the trial court granted. Appellant's trial was continued to September 12, 2017. Appellant requested two subsequent continuances until his trial was ultimately rescheduled to November 28, 2017. The total time elapsed from appellant's first requested continuance until his November 28, 2017 trial date was 119 days. Because appellant requested these continuances, all of these 119 days are chargeable to appellant pursuant to R.C. 2945.72(H) and are not counted toward the time appellant was required to be brought to trial under R.C. 2945.71.

{¶ 61} On November 28, 2017, the state requested a continuance of appellant's trial. On that date, the state informed the trial court that L.S. would be unable to participate at trial as she was engaged in inpatient mental health treatment. The state explained that the treatment was necessary due to the victim's continued suicidal

30.

ideations and that until the juvenile court determined she could be transported from treatment, she would be unable to appear for trial. Over appellant's objection, the trial court granted the state's request and the matter was reset for trial on January 30, 2018. A total of 68 days elapsed from the state's request for a continuance and the rescheduled trial date.

{¶ 62} Appellant argues that because he objected to the request, and because the trial court did not make a specific finding that the request was reasonable, that these days are chargeable to the state. We disagree. Appellant is correct that the trial court's entry does not identify the bases on which it granted the continuance. "If the journal entry does not contain the reason for the continuance, the reviewing court can look to other evidence in the record to determine whether the continuance was reasonable." *Crawford* at ¶ 32. Thus, the trial court's omission of the reasonableness of the state's request is immaterial and this court reviews whether a continuance was reasonable, and therefore not chargeable to the state against appellant's speedy-trial rights, based on the "facts and circumstances of the case." *Id.* Having reviewed the record, we find that the state's request was reasonable. The state provided a specific basis for its request—L.S.'s continued mental health treatment—and explained that steps had been taken through filings in the juvenile court to avoid requesting the continuance. Based on these circumstances, we find that the state's request for a 68-day continuance was reasonable

31.

and that the time elapsed does not run against the state's statutory speedy-trial obligations pursuant to R.C. 2945.72(H).

{¶ 63} Case No. CR 2017-2020 was dismissed, without prejudice, on January 30, 2018. For the foregoing reasons, we find that only 45 of the 227 days appellant was held in jail in lieu of bail during that time were chargeable to the state under R.C. 2945.71.

{¶ 64} Upon refiling of the charges under case No. CR 2019-2802 on October 16, 2019, the state's obligation to bring appellant to trial within 90 days of his original indictment resumed. *Broughton* at 260. 14 days later, at an October 30, 2019 pretrial, appellant signed a waiver of his speedy-trial rights and consented to a trial date of January 7, 2020. The initial 14 days in which appellant was in custody are chargeable to the state. However, appellant's valid waiver of his speedy-trial rights for a period of 69 days precluded that time from being applied toward the state's time constraints under R.C. 2945.71. *See State v. Patterson,* 6th Dist. Wood Nos. WD-17-045 and WD-17-046, 2018-Ohio-4672.

{¶ 65} Between January 7, 2020 and the commencement of appellant's trial on March 10, 2020, the trial court granted three more continuances. Appellant requested two of those continuances, each lasting 21 days. Pursuant to R.C. 2945.72(H), these 42 days were chargeable to appellant. On January 28, 2020, the state made its final request for a continuance because L.S. had undergone a medical procedure which prohibited her from appearing. We find that the state's request was reasonable as, again, it was

32.

premised on L.S.'s inability to appear for a legitimate medical reason. Further, appellant's own requests for two, 21-day continuances during this same time period, the same amount requested by the state, reflects the reasonableness of the state's request. As a result, we find that none of the 63 days which elapsed between January 7, 2020 and March 10, 2020, are chargeable to the state's statutory obligation to commence appellant's trial within 90 days pursuant to R.C. 2945.71.

{¶ 66} Appellant's trial in case No. CR 2019-2802 commenced on March 10, 2020. At that time, he had been held in jail in lieu of bail from the date of his reindictment until his trial, a period of 146 days. We find that only 14 of those days were chargeable to the state as all other continuances were either requested by appellant, were the result of appellant's valid, signed waiver of his speedy trial rights, or were the result of a reasonable request for continuance by the state pursuant to R.C. 2945.72(H). Combined with the 45 days chargeable to the state from case No. 2017-2020, appellant was held in jail in lieu of bail for an aggregate period of 59 days chargeable against his speedy-trial rights from the date of his initial 2017 arrest and the commencement of his trial. Therefore, the state met its burden to bring appellant to trial within 90 days as required by R.C. 2945.71. As a result, we find appellant's third assignment of error not well-taken.

33.

### D. Appellant's Convictions were not allied offenses which should have been merged for purposes of sentencing.

{¶ 67} In his fourth assignment of error, appellant argues that his convictions for sexual battery and rape constituted allied offenses of similar import and should have been merged at sentencing. R.C. 2941.25 prohibits multiple convictions for "allied offenses of similar import" arising from the same conduct. "[W]henever a court considers whether there are allied offenses that merge into a single conviction, the court 'must first take into account the conduct of the defendant. In other words, how were the offenses committed.'" *State v. Tellis,* 6th Dist. Wood No. WD-19-050, 2020-Ohio-6982, ¶ 74, citing *State v. Ruff,* 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 25. To determine whether multiple convictions constitute allied offenses, the court must address three questions: (1) did the offenses involve either separate victims or "separate and identifiable harm, (2) were the offenses committed separately, and (3) were the offenses committed with separate animus?" *Ruff* at ¶ 25. "An affirmative answer to any of the above will permit separate convictions." *Tellis* at ¶ 74.

{¶ 68} Appellant argues that all of his offenses are allied offenses, because the elements of each of the crimes charged in the amended indictment—as given to the jury by the trial court—are so similar, and the timeframe alleged in each count of the indictment is identical, so we cannot be certain that the jury found him guilty of six separate offenses. He claims that the lack of jury interrogatories make it impossible for us to "determine if the jury intended to make separate findings as to each of the six

34.

counts[,]" thus making it impossible to determine whether he committed separate offenses. We disagree.

{¶ 69} We note that appellant did not raise this argument at sentencing. "An accused's failure to raise the issue of allied offenses of similar import in the trial court forfeits all but plain error, and a forfeited error is not reversible error unless it affected the outcome of the proceeding and reversal is necessary to correct a manifest miscarriage of justice." *State v. McKinney,* 6th Dist. Lucas No. L-19-1033, 2020-Ohio-3547, ¶ 27, citing *State v. Rogers,* 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 3. Therefore, we review the trial court's judgment for plain error.

{¶ 70} At trial, L.S. testified, after some clarification, that appellant engaged in sexual conduct with her on 50 to 100 occasions during the time period described in the amended indictment. Among those instances were act of (1) vaginal penetration in appellant's father's living room in April 2016, (2) vaginal penetration while L.S. lived with M.D., (3) L.S. performing oral sex on appellant while she lived with M.D., (4) appellant performing oral sex on L.S. while she lived with M.D., (5) vaginal penetration at a cousin's house in July 2016, and (6) vaginal penetration in a bedroom at appellant's father's house. From this testimony, it is evident that the charged conduct occurred on at least 6 *separate* occasions. Based on her testimony, we answer the second question identified in *Ruff*—whether the offenses were committed separately—in the affirmative. Therefore, appellant's convictions are not allied offenses that should have merged at

35.

sentencing. *See Ruff* at ¶ 25, *Tellis* at ¶ 74. For this reason, we find that the trial court did not commit any error, let alone plain error, by sentencing appellant on each individual conviction and appellant's fourth assignment of error not well-taken.

### III. Conclusion

**{¶ 71}** For the foregoing reasons, we find each of appellant's four assignments of error not well-taken and we affirm the March 18, 2020 judgment of the Lucas County Court of Common Pleas.

**{¶ 72}** Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.                    _____
                                                        JUDGE
Christine E. Mayle, J.

Myron C. Duhart, P.J.                                 JUDGE
CONCUR.

                                        _____
                                                        JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.