[Cite as *State v. Sproles*, 2023-Ohio-3403.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                         Court of Appeals No.  L-22-1184

    Appellee                                       Trial Court No.  CR0202201308

v.

Preston Sproles                                   **DECISION AND JUDGMENT**

    Appellant                                     Decided:  September 22, 2023

* * * * *

Julia R. Bates, Lucas Count Prosecuting Attorney, and
Lauren Carpenter, Assistant Prosecuting Attorney, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**SULEK, J.**

**{¶ 1}** Appellant Preston Sproles appeals the judgment of the Lucas County Court

of Common Pleas after a jury found him guilty of one count of robbery, in violation of

R.C. 2911.02(A)(2), and three counts of kidnapping, in violation of R.C. 2905.01(A)(2).

For the following reasons, the judgment is affirmed.

## I. Background

{¶ 2} On February 24, 2022, the Lucas County Grand Jury indicted Sproles on one count of aggravated robbery, in violation of R.C. 2911.01(A)(1), with firearm and repeat violent offender specifications; one count of robbery, in violation of R.C. 2911.02(A)(2), with firearm and repeat violent offender specifications; three counts of kidnapping, in violation of R.C. 2905.01(A)(2), each with firearm and repeat violent offender specifications; and one count of having weapons under disability, in violation of R.C. 2923.13(A)(2). The matter ultimately proceeded to a two-day jury trial.

{¶ 3} The evidence and testimony from the trial revealed that around 7:00 a.m. on December 2, 2021, Sproles made multiple calls from a gas station asking his girlfriend, A.C., to pick him up. A.C. picked up Sproles with her five children in the vehicle. Around 8:00 a.m., A.C. dropped her three oldest children off at school with the two youngest children remaining in the car. The events occurring after A.C. dropped her children off at school gave rise to the criminal charges.

{¶ 4} The state first played a 911 call placed by A.C.'s sister at approximately 9:00 a.m. on December 2, 2021. In the call, the sister reports that A.C. told her that Sproles pulled a gun on A.C. and made her give him all of her money.

{¶ 5} Toledo Police Officer Scott Campbell responded to A.C.'s residence at approximately 9:10 a.m. Campbell testified at trial that when he encountered A.C., she "looked like she was visibly upset, possibly been crying, anxious, [and] nervous" from

2.

something that had immediately just occurred prior to his arrival. Campbell began to describe what A.C. told him, at which point Sproles objected to the testimony as hearsay. The trial court overruled Sproles' objection, finding that A.C.'s statements met the excited utterance exception to the hearsay rule. Campbell then testified that A.C. told him that police were requested because she was ordered to withdraw money from an ATM at gunpoint by her ex-boyfriend.

{¶ 6} Over Sproles' objection, the state played the video from Campbell's body camera of his interaction with A.C. In the video, a noticeably distraught A.C. stated that after she dropped her kids off at school, Sproles took a black gun partially out of his pocket and ordered her to pull the car over. Sproles told A.C. that he was going to kill her and "blow her brains out" if she did not listen to him. He then ordered A.C. to drive to an ATM and give him some money. After she gave him $120, Sproles again told her that she needed to listen to him and that her life depended on it. He had A.C. drop him off at a location that A.C. could not remember. Sproles then touched A.C.'s face and told her that he was going to "f*** all this up" and that if he could not have her, no one could have her because he loved her that much. A.C. stated that Sproles put a gun in her mouth and told her that she was lucky her kids were there otherwise he would have killed her. After dropping Sproles off, A.C. went back to her townhouse to pack things so that she could leave and get away from him. A.C. stated that the two had been having trouble in

3.

their relationship and that she was legitimately afraid of him, but that this was the first time he pulled a gun on her and threatened to kill her.

{¶ 7} At approximately 9:45 a.m., Toledo Police Detective Jeffrey Sharp arrived at A.C.'s residence to speak with her. Sharp described A.C.'s demeanor as "upset." He explained that there were times throughout the interview where she "became choked up, emotional and -- clearly was disturbed and upset by what had occurred."

{¶ 8} Sharp then began to testify to what A.C. told him, to which Sproles objected on the grounds that the testimony was hearsay and that it violated his confrontation clause rights. In response to the objection, the court excused the jury and allowed Sharp to be examined on the circumstances of his interview with A.C. Sharp testified that he interviewed A.C. at her residence and that she was packing her belongings to leave so that she would be at a different location if Sproles returned. Sharp explained that in interviewing A.C. he wanted to know what had happened, who committed the act, and where that person might be. Sharp testified that he relayed that information to other law enforcement personnel because he received information that Sproles was armed, and having an armed suspect at large presents a danger to the victim, other witnesses, the public, and any officers that may come into contact with him. Following this examination, the trial court overruled Sproles' objection. The court reasoned that A.C.'s statements to Sharp fell under the excited utterance exception to the hearsay rule. Further, the court reasoned that A.C.'s statements were non-testimonial, and thus did not

4.

implicate the confrontation clause, because the situation presented an on-going emergency with an armed suspect not in custody and because the interview was conducted at A.C.'s home where she was actively packing in an attempt to flee instead of at the Toledo Police Department.

{¶ 9} After that interlude, and over Sproles' objection, the state played the video of Sharp's interview with A.C., during which A.C. stated that Sproles called her in the morning from a gas station wanting her to come pick him up. Sproles was agitated because A.C. did not immediately come to get him. While Sproles was arguing with A.C., he took a gun out of his pocket and told A.C. to pull the car over, saying that he wanted some money. Sproles told A.C. to follow his instructions and that her life depended on it. When they arrived at the carryout, Sproles threatened A.C. that he was going to blow her brains out. As A.C. got out of the car, Sproles was afraid that she was going to call the police, so he initially did not let her children go with her. However, A.C.'s four-year-old child was upset, so Sproles let him go into the carryout with A.C., but Sproles remained in the car with A.C.'s two-year-old child. After A.C. returned with $120, Sproles ordered her to drive. He continued to yell at her and threaten to kill her. Shortly thereafter, Sproles told A.C. to drop him off somewhere. Sproles again yelled at A.C. that she was lucky that her kids were there or else he would have killed her. Sproles then left with his gun and A.C. drove away. On her way back home, A.C. stopped at a Rite Aid to get some cigarettes and a lighter. A.C. then called her sister.

5.

{¶ 10} A.C.'s sister testified about what A.C. told her when she called that morning. Over the objection of Sproles, A.C.'s sister testified that A.C. called her and was "frantic, sobbing, overwhelmed," and told her that Sproles had pulled a gun on her and demanded money from her. A.C. described that the gun was black. A.C. also told her sister that she drove to the nearest carryout to get the money for Sproles and that Sproles would not allow her to take her two-year-old child inside the store with her, but she was able to take her four-year-old child.

{¶ 11} In addition to the above testimony, the state presented the surveillance video from the convenience store where A.C. withdrew the $120. The video shows A.C. entering the store at approximately 8:04 a.m. with her four-year-old child, and proceeding to use the ATM. Sproles can be seen in the passenger side of A.C.'s minivan.

{¶ 12} The state also presented Sharp's videotaped interview with Sproles. In the interview, Sproles stated that he called A.C. to get a ride from the gas station back to A.C.'s townhouse. After A.C. dropped her older kids off at school, she and Sproles were arguing and A.C. was yelling at Sproles and driving him mad. Sproles stated that he then put his hands in his pockets and A.C. asked him if he had a gun. Sproles responded that it was not a gun, it was an asthma inhaler. According to Sproles, they drove from the school and A.C. told him that she was going to give him some money so that he would go away, because he was always calling her to give him some money. Sproles told A.C. that he did not want the money, but she threw it at him and he took it. The two continued to

6.

argue until she dropped him off on Detroit Avenue where he told her to let him out of the car. Sproles said that he never threatened to kill her. Sproles stated that he loved A.C. and they were just arguing, but sometimes she is crazy.

{¶ 13} Finally, the state presented recorded jailhouse calls and text messages between Sproles and A.C. from December 4 through December 6, 2021. In the messages, on December 4, 2021, A.C. initially told Sproles that she loves him, but that he needs to get help. The next day, Sproles messaged A.C. begging her not to "go through with this shit," because he is looking at a lengthy prison sentence. Sproles also mentioned that she could get in trouble for filing false charges. The two then talked on the phone, during which A.C. told Sproles that he knows what he did. After the call, A.C. messaged Sproles expressing disbelief that Sproles would act like he did not say all the things that he said to her. A.C. told Sproles not to contact her anymore because "we both know what you did and what you said to me my life depended on following your direction that what you told me then it was I was going to pull over and put it in my mouth and I was lucky the kids was in the car." Shortly thereafter, the two argued on the phone again. A.C. stressed that she did not use the words "robbery" or "kidnapping" when she spoke with the police, but she told them what he said when he told her to "pull the f*** off and do what the f*** I say because I went and got a gun just to kill you!" The next day, the two spoke again on the phone and through messages. A.C. told Sproles that she was leaving him and leaving Toledo and starting over with her life.

7.

{¶ 14} Sproles, however, introduced messages from January and February 2022, wherein A.C. reiterated that she never said that Sproles robbed or kidnapped her. Specifically, on February 3, 2022, A.C. told Sproles, "this shit bullshit because you absolutely didn't rob me at all in any shape way or form you didn't have no gun on you and you absolutely didn't kidnap [the four-year-old child] I am going to fight this in every way I can you didn't do any of that shit this shit all bullshit and I hate they did this shit to you." Likewise, on February 13, 2022, A.C. told Sproles, "I admit I was scared cuz no I don't want to get in trouble but I don't want you to get in trouble for something you really didn't did cuz I was mad at you for a lot of shit then I tried to justify it with I was hoping you get off drugs it ain't right and I'm sorry I really am but I really was coming from a good place cuz I know when you sit down * * * you're a different person and I miss that person."

{¶ 15} Following the state's presentation of evidence, Sproles moved for an acquittal pursuant to Crim.R. 29(A), which the trial court denied.

{¶ 16} Sproles then discussed calling A.C. as a witness, but upon learning that A.C. was simply going to invoke her Fifth Amendment right against self-incrimination, he decided not to call her and rested without presenting any evidence.

{¶ 17} The jury found Sproles guilty on the count of robbery and the three counts of kidnapping, and not guilty on the counts of aggravated robbery, having a weapon under disability, and the firearm specifications. In addition, the jury made a specific

8.

finding that all three kidnapping victims were released in a safe space and unharmed, which reduced the kidnapping charges to felonies of the second degree.

{¶ 18} At sentencing, the trial court considered the issue of merger and found that the offenses of robbery and kidnapping did not merge. The court then proceeded to sentence Sproles to an indefinite prison term of seven to ten and one-half years on the count of robbery, and a definite prison term of seven years on each count of kidnapping. The court further ordered the sentences to be served consecutively for a total prison term of 28 to 31 1/2 years.

## II. Assignments of Error

{¶ 19} Sproles has timely appealed his judgment of conviction and now asserts four assignments of error:

1. The trial court committed reversible error by allowing hearsay evidence to be admitted pursuant to the excited utterance exception, Evid. R. 803(2).

2. The trial court committed reversible error by refusing to find that the offenses here were allied offenses of similar import, committed with one animus, as one continuous bad act.

3. The trial court abused its discretion by denying appellant's motion for acquittal on the basis of insufficient evidence, pursuant to Crim.R. 29.

4. In the alternative, the convictions against him were against the manifest weight of the evidence.

### III. Analysis

{¶ 20} For ease of discussion, Sproles' arguments will be addressed out of order, beginning with his first assignment of error.

### A. Confrontation Clause

{¶ 21} Although Sproles' first assignment of error purports to challenge the trial court's admission of A.C.'s hearsay statements as excited utterances, the entirety of his argument pertains to whether the trial court violated his Confrontation Clause rights. Specifically, Sproles argues that A.C.'s statements to her sister, Officer Campbell, and Detective Sharp were testimonial in nature.

{¶ 22} Evidentiary rulings that implicate the Confrontation Clause are reviewed de novo. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 97; *State v. Ford*, 6th Dist. Lucas Nos. L-20-1054, L-20-1112, 2021-Ohio-3058, ¶ 21.

{¶ 23} The Confrontation Clause of the Sixth Amendment to the United States Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *." "Admission of an out-of-court statement of a witness who does not appear at trial is prohibited by the Confrontation Clause if the statement is testimonial unless the witness is unavailable and the defendant had had a prior opportunity to cross-examine the witness." *State v. Jones*, 135 Ohio St.3d

10.

10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 137, citing *Crawford v. Washington*, 541 U.S. 36, 54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). "The Confrontation Clause applies only to 'testimonial statements.'" *State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, ¶ 181, citing *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, ¶ 59. Generally, "[a] statement is testimonial if it is made with 'a primary purpose of creating an out-of-court substitute for trial testimony.'" *Id.*, quoting *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶ 87.

{¶ 24} Addressing A.C.'s statements to her sister first, the circumstances clearly indicate that her primary purpose was not to create an out-of-court substitute for trial testimony. A.C. called her sister crying and hysterical, traumatized by what had recently occurred in her car with Sproles. A.C. was looking for help, not seeking to provide testimony against Sproles. A.C.'s statements to her sister, therefore, were nontestimonial.

{¶ 25} Turning to A.C.'s statements to Officer Campbell and Detective Sharp, in the context of police interviews,

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the

primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Jones* at ¶ 145, quoting *Hammon v. Indiana*, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.3d.2d 224 (2006). "[W]hether an emergency exists and is ongoing is a highly context-dependent inquiry." *Id.* at ¶ 151, quoting *Michigan v. Bryant*, 562 U.S. 344, 363, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011).

{¶ 26} Sproles argues that the present situation is similar to that in *Toledo v. Sailes*, 180 Ohio App.3d 56, 2008-Ohio-6400, 904 N.E.2d 543 (6th Dist.), in which this court held that the trial court erred in admitting the statements of Sailes' girlfriend, Sharita. In that case, the police responded to Sailes' residence on a call that a woman had been assaulted. One officer interviewed Sailes, while another went upstairs and spoke with Sharita. Sharita did not testify at trial, but the officer who spoke with her testified that Sharita reported that Sailes hit her several times in the stomach, face, and chest, and then dragged her downstairs by her hair. *Id.* at ¶ 7. Sailes objected to this testimony as being in violation of his Confrontation Clause rights, which the trial court denied.

{¶ 27} On appeal, this court reversed and concluded that Sharita's statements were testimonial in nature because they were made after the officers had secured the scene and there was "no evidence of an ongoing emergency at the time the officers arrived or while they remained." *Id.* at ¶ 17. Further, this court determined that the "primary purpose of the officer's interrogation of Sharita was to clarify Sharita's version of past events that

12.

could be relevant to later prosecution." *Id.* Therefore, this court held that the admission of Sharita's statements to the officer violated Sailes' constitutional right to confront the witnesses against him. *Id.* at ¶ 18.

{¶ 28} As noted by the state, this court recently addressed a similar situation again in *Ford* where the police responded to the victim's apartment following a 911 call from her neighbor reporting that the victim had just been assaulted by Ford. The 911 caller further reported that Ford had left the scene and was walking down the road. Upon arriving, the officer spoke with the victim and the interview was recorded by the officer's body camera. The victim did not testify at the trial, but the recorded interview was played for the jury. In the recorded interview, the victim described that Ford choked her to the point that she could not breathe and she lost consciousness. *Ford*, 6th Dist. Lucas Nos. L-20-1054, L-20-1112, 2021-Ohio-3058, at ¶ 13. She also described that Ford caused her shoulder to become dislocated and that she had carpet burns from being dragged. *Id.*

{¶ 29} Ford argued on appeal that the admission of the victim's recorded statements violated his Confrontation Clause rights. This court disagreed, reasoning that the police arrived on the scene just minutes after the assault and while Ford's whereabouts were unknown. In addition, the questions asked by the police indicated that their primary purpose was to enable the police to assess the extent of the emergency:

13.

[W]hen police found "a very shaken up" and "crying" M.M. at the scene, they asked M.M. if she had been "hit." They also asked a series of questions about her attacker including his name, his date of birth and social security number, where "would he go," whether he knew anyone in the area, whether he "had a key to get in here" and whether M.M. "could lock the door" after police had gone.

*Id.* at ¶ 24. Finally, this court noted that the questioning occurred at the victim's apartment, not police headquarters, and that neither the police nor M.M. knew when Ford would return. Thus, this court held that the victim's statements "were nontestimonial in nature and not subject to the Confrontation Clause." *Id.* at ¶ 27.

{¶ 30} Upon review, the present situation is more akin to *Ford.* The police responded to a visibly distraught A.C., who was packing in an attempt to flee before Sproles returned home. Based on the information provided by A.C., Sproles was armed and had just threatened to kill A.C. Unlike *Sailes*, Sproles' location was unknown. Further, like *Ford*, Campbell and Sharp questioned A.C. about Sproles' name, his birthdate, his social security number, and any locations where he might be. Sharp testified that he relayed this information to other law enforcement personnel because Sproles presented a threat to A.C., other witnesses, the public, and any officers who might come into contact with him. Finally, the interviews were conducted on scene at A.C.'s townhouse, not at the police station. These circumstances objectively indicate that

14.

Campbell's and Sharp's questioning had the primary purpose to meet an ongoing emergency. Therefore, A.C.'s statements to Campbell and Sharp were nontestimonial in nature.

{¶ 31} Because A.C.'s statements were nontestimonial in nature, the trial court did not violate Sproles' Confrontation Clause rights when it admitted A.C.'s statements to her sister or as recorded on Campbell's and Sharp's body camera video.

{¶ 32} Accordingly, Sproles' first assignment of error is not well-taken.

## B. Sufficiency of the Evidence

{¶ 33} In his third assignment of error, Sproles argues that the trial court erred when it denied his Crim.R. 29(A) motion for acquittal. "A motion for acquittal under Crim.R. 29(A) is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37; *State v. Herrera*, 2022-Ohio-4769, 204 N.E.3d 1096, ¶ 25 (6th Dist.). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 34} In support of his arguments, Sproles relies on the text messages from the victim saying that Sproles did not rob or kidnap her. He also claims that A.C. could not have been restrained of her liberty since she was the driver of the vehicle.

15.

**{¶ 35}** Sproles was convicted of robbery in violation of R.C. 2911.02(A)(2), which states, "No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall do any of the following: * * * (2) Inflict, attempt to inflict, or threaten to inflict physical harm on another," and kidnapping in violation of R.C. 2905.01(A)(2), which provides, "No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes: * * * (2) To facilitate the commission of any felony or flight thereafter."

**{¶ 36}** Although A.C. told Sproles months later that he did not rob or kidnap her, her descriptions of the events of December 2, 2021, to her sister, Campbell, and Sharp satisfy the elements of robbery and kidnapping. A.C. stated that Sproles pulled out a black gun and threatened to kill her if she did not obey him. Sproles argues that he did not actually possess a gun, and points to his acquittal on the charges of aggravated robbery, possessing a weapon while under disability, and the firearm specifications. Possession of a firearm, however, is not a necessary element of robbery or kidnapping; the threat of inflicting physical harm is sufficient. And according to A.C.'s statements on December 2, 2021, Sproles threatened to kill her if she did not drive to a convenience store and withdraw money to give to him. He threatened her life again after receiving the money and ordering her to drive him to the place where he wanted to be dropped off.

16.

Video evidence confirms that A.C. went to an ATM and withdrew money while Sproles was in the car, and Sproles admitted that he received the money from A.C.

{¶ 37} Viewing this evidence in a light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that Sproles threatened to commit physical harm on A.C. in an attempt to commit a theft offense. Thus, the evidence is sufficient to support his conviction for robbery.

{¶ 38} Likewise, a rational trier of fact could have found beyond a reasonable doubt that Sproles by force or threat removed A.C. and her two children from where they were found or restrained their liberty by forcing A.C. to drive to where he wanted to go to facilitate his commission of the robbery offense. Thus, the evidence is sufficient to support his convictions for kidnapping.

{¶ 39} Accordingly, Sproles' third assignment of error is not well-taken.

### C. Manifest Weight

{¶ 40} In his fourth assignment of error, Sproles contends that his convictions were against the manifest weight of the evidence. Unlike a claim of insufficient evidence, which examines whether the evidence is legally sufficient to support the verdict as a matter of law, a claim that the conviction is against the manifest weight of the evidence addresses the evidence's effect of inducing belief. *Herrera* at ¶ 37, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. In determining whether a conviction is against the manifest weight of the evidence, an appellate court,

17.

sitting as a "thirteenth juror," reviews "the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶ 41} Here, it is undisputed that Sproles was in the car with A.C. and that A.C. went to an ATM, withdrew $120, and gave that money to Sproles. The questions that must be resolved are what occurred in the car and what precipitated A.C. taking money out of the ATM. The only evidence answering those questions are A.C.'s statements to her sister, Campbell, and Sharp, and Sproles's statements in his recorded interview with Sharp. Thus, the case turns on the relative credibility between A.C. and Sproles. Considering the entire record, the evidence supports the conclusion that A.C. was credible when she made her allegations against Sproles. Shortly after the event, A.C. contacted her sister panicked, crying, and upset. A.C. then began packing her things to leave to get away from Sproles. A.C. was still visibly upset when she spoke with Campbell and then Sharp. A.C. maintained her story for several days after the event, telling Sproles in a jailhouse phone call that "we both know what you did and what you

18.

said to me my life depended on following your direction that what you told me then it was I was going to pull over and put it in my mouth and I was lucky the kids was in the car." It was not until two months and many phone calls with Sproles later that A.C. stated that Sproles did not rob or kidnap her. Based upon this evidence, the jury did not clearly lose its way and create a manifest miscarriage of justice when it found Sproles guilty of robbery and kidnapping.

{¶ 42} Accordingly, Sproles' fourth assignment of error is not well-taken.

### D. Merger

{¶ 43} Finally, in his second assignment of error, Sproles argues that the trial court erred in failing to merge his convictions of robbery and kidnapping.

{¶ 44} "R.C. 2941.25 codifies the protections of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10, Article 1 of the Ohio Constitution, which prohibit multiple punishments for the same offense." *State v. Rogers*, 6th Dist. Erie Nos. E-21-027, E-21-031, 2022-Ohio-4126, ¶ 16. That section provides,

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

19.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

R.C. 2941.25.

{¶ 45} The test for determining whether allied offenses should be merged is well-established:

As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.

*State v. Bailey*, Slip Opinion No. 2022-Ohio-4407, ¶ 10, quoting *State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266, ¶ 12, quoting *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 31. "[T]wo or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct

20.

constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Ruff* at ¶ 23.

{¶ 46} "The defendant bears the burden of establishing his entitlement to the protection, provided by R.C. 2941.25, against multiple punishments for a single criminal act." *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, 999 N.E.2d 661, ¶ 18, quoting *State v. Mughni*, 33 Ohio St.3d 65, 67, 514 N.E.2d 870 (1987); *State v. Smith*, 2023-Ohio-866, 210 N.E.3d 1177, ¶ 10 (6th Dist.). "An appellate court reviews de novo whether offenses should be merged as allied offenses under R.C. 2941.25. *Smith* at ¶ 10, citing *Bailey* at ¶ 6.

{¶ 47} In support of his argument for merger, Sproles contends that A.C. was driving the vehicle and therefore he could not have kidnapped her two children or caused them a separate harm. Additionally, he argues that A.C. did not go out of her way to stop at the ATM and asks this court to find that it was "one continuous bad act" with one animus or motivation to simply obtain money from A.C. Sproles' arguments present two issues: (1) whether the three offenses of kidnapping should merge with each other and (2) whether the offense of robbery should merge with the kidnapping offenses.

{¶ 48} Regarding the first issue, Sproles argues that the three kidnapping offenses were committed continuously and with one motivation, thus they should merge. Despite arising from one course of conduct, however, the three kidnapping offenses were dissimilar in import because Sproles's conduct affected three victims: A.C. and her two

21.

children. Although A.C. was driving, all three victims were moved from the place where they were found or restrained of their liberty when Sproles got into the car and threatened to kill A.C. if she did not obey his directions. Because the offenses were dissimilar in import, the trial court did not err when it declined to merge the three kidnapping offenses at sentencing.

{¶ 49} Regarding the second issue, when determining if kidnapping and another offense merge, the primary question is "whether the restraint or movement of the victim is merely incidental to a separate underlying crime or, instead, whether it has a significance independent of the other offense." *State v. Logan*, 60 Ohio St.2d 126, 135, 397 N.E.2d 1345 (1979); *State v. Dean*, 2018-Ohio-1740, 112 N.E.3d 32, ¶ 66 (6th Dist.). "Where the restraint of the victim is prolonged, the confinement of the victim secretive, or the movement of the victim is substantial, there exists a separate animus for each offense." *State v. McKinney*, 6th Dist. Lucas No. L-19-1033, 2020-Ohio-3547, ¶ 28, citing *Logan* at syllabus. "A separate animus also exists where 'the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime.'" *Id.*, quoting *Logan* at syllabus.

{¶ 50} In *McKinney*, the offenses of kidnapping and rape did not merge where the victim willingly got into McKinney's car, but McKinney "began hitting and choking her and telling her to shut up," and then "displayed a gun." *Id.* at ¶ 30. The victim "went along because she 'didn't want to die.'" *Id.* When they arrived at the house, McKinney

22.

told the victim to go upstairs "where he continued to physically assault her and then proceeded to vaginally rape her." *Id.* Under those circumstances, this court held that there was a "separate and identifiable harm related solely to the kidnapping count." *Id.* at ¶ 31.

{¶ 51} Similarly, in *Dean*, the offenses of kidnapping and rape did not merge where Dean approached the victim from behind while she was walking down the street, showed her a gun, and told her "if you don't come with me, I'm going to shoot you out here." *Dean* at ¶ 2. Dean then led the victim for a block or two down the street to a porch in a dark alley where he ordered her to perform oral sex twice. *Id.* at ¶ 3. The victim testified that while she was walking down the street, she "just knew [she] was going to die." *Id.* at ¶ 64. In holding that the offenses did not merge, this court concluded that the victim suffered a separate and identifiable harm from the kidnapping, that the kidnapping was committed separately and with a separate animus, and that the kidnapping was not merely incidental to the rapes. *Id.* at ¶ 65-66, 69. In support, this court relied upon the length of Dean's forced movement of the victim down several city blocks, the overall duration of the restraint, and Dean's confinement over the victim in a dark patio of an abandoned house. *Id.* at ¶ 65.

{¶ 52} Lastly, in *State v. Nickelson*, 6th Dist. Wood No. WD-06-023, 2007-Ohio-6367, ¶ 66-69, this court held that the offenses of kidnapping and robbery did not merge. In that case, Nickelson and another person broke into a health care facility seeking to

23.

steal prescription drugs. Once inside, they encountered three different workers, Smothers, Whitenack, and Martin. Smothers and Whitenack were located behind a nurses' station when Nickelson jumped over the counter and ordered them to kneel down. Nickelson demanded the supply of medication and Smothers told them that she had the key. Nickelson ordered Whitenack to kneel down and not move, and twice threatened her, saying "Don't make me hurt you." *Id.* at ¶ 11-12. Whitenack then felt something placed against her head. *Id.* at ¶ 11. Nickelson then went with Smothers and the other person to the "med room" where he took bags of prescription drugs. As the men tried to leave, they seized Smothers and said that she was going with them. *Id.* at ¶ 10. Smothers refused and the men got angry and told her to go into a resident's room. *Id.* The men tried to leave out of a side door, but it was not opening immediately. Martin, the third worker, suggested an alternate exit through the front door. *Id.* at ¶ 6. Nickelson then seized Martin and said, "you know we'll kill you" and "you are going with us." However, as the men were leaving with her, Martin grabbed onto a nearby railing to prevent them from taking her out of the building. *Id.* Nickelson was convicted of one count of robbery and three counts of kidnapping.

{¶ 53} On appeal, this court rejected Nickelson's arguments that the offense of robbery should have merged with the offenses of kidnapping, holding that the three kidnappings were not merely incidental to the robbery. *Id.* at ¶ 65. As to Whitenack, although she was not moved or secretly confined, "her restraint was prolonged enough

24.

and the risk of harm threatened against her if she moved was substantial enough to demonstrate a separate animus from the underlying robbery conviction." *Id.* at ¶ 69. As to Smothers, Nickelson's statement that she was going with them and the confinement of Smothers in the resident's room established a purpose independent from the robbery. *Id.* at ¶ 67. As to Martin, Nickelson's conduct in dragging her by the waist down the hallway in an attempt to remove her from the premises constituted "significant movement and restraint, indicating a separate purpose independent from the robbery." *Id.* at ¶ 66.

{¶ 54} Like *McKinney*, *Dean*, and *Nickelson*, the evidence in this case demonstrates that the kidnapping was not merely incidental to the robbery, but instead it was committed separately and with a separate animus. The kidnapping was prolonged as Sproles ordered A.C. to drive him to a convenience store to withdraw money from the ATM and then ordered her to drive somewhere else to drop him off. During this time, Sproles caused A.C. to fear for her life, telling her that he was going to "blow her brains out" if she did not listen to him. Under the facts and circumstances of this case, the trial court did not err in failing to merge the offenses of kidnapping and robbery.

{¶ 55} Accordingly, Sproles' second assignment of error is not well-taken.

25.

## IV. Conclusion

**{¶ 56}** For the foregoing reasons, the judgment of the Lucas County Court of

Common Pleas is affirmed.  Sproles is ordered to pay the costs of this appeal pursuant to

App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.                          _____
                                                    JUDGE

Myron C. Duhart, P.J.

                                          _____
Charles E. Sulek, J.                                      JUDGE
CONCUR.

                                          _____
                                                  JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.