[Cite as *State v. Hannah*, 2024-Ohio-2103.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                   Court of Appeals No.  L-23-1115

    Appellee                              Trial Court No.  CR0202202769

v.

Shomari L. Hannah                         **DECISION AND JUDGMENT**

    Appellant                             Decided:  May 31, 2024

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**SULEK, P.J.**

{¶ 1} Appellant Shomari Hannah appeals the judgment of the Lucas County Court of Common Pleas convicting him, following a jury trial, of six counts of attempted murder, six counts of felonious assault, and numerous firearm specifications.  For the following reasons, the trial court's judgment is affirmed.

## I. Factual Background and Procedural History

{¶ 2} On October 19, 2022, the Lucas County Grand Jury returned a twelve-count indictment against Hannah and Chicha Harris. The indictment charged Hannah with six counts of attempted murder in violation of R.C. 2903.02(A) and 2923.02, felonies of the first degree, and six counts of felonious assault in violation of R.C. 2903.11(A)(2) and (D), felonies of the second degree, along with attendant firearm specifications under R.C. 2941.145(A), (B), (C), and (F) and 2941.146(A), (B), and (D). The charges stemmed from a drive-by shooting that occurred in the early morning hours of January 21, 2022. Hannah entered a not guilty plea and the matter proceeded to a four-day jury trial.[1]

{¶ 3} Surveillance video entered into evidence showed that around 1:09 a.m. on January 21, 2022, a man wearing a yellow jacket entered the Gas & Go convenience store located at 1530 Cherry Street in Toledo, Ohio. Twenty seconds later, a blue Dodge Charger pulls up to a gas pump and two men get out of the passenger side of the car. One is taller and slender and is wearing light colored pants and a beige-colored sweatshirt with a design on the front. He is seen texting or using his phone with his left hand. The other is shorter and wearing red pants, a black sweatshirt, and a red hat. A third person wearing a blue jacket is seen briefly stepping out of the driver's door of the car, but ultimately stays in the vehicle. The two men enter the convenience store and within

---

[1] Prior to the trial, Hannah's co-defendant, Chicha Harris, pleaded guilty to one count of attempted murder with a firearm specification, one count of felonious assault with a firearm specification, and two counts of attempted felonious assault. The remaining counts were dismissed.

seconds run back out of it, meeting up with the driver of the blue Charger. The three individuals get back into the car, with the person wearing the beige-colored sweatshirt getting into the rear passenger seat.

{¶ 4} Once in the car, the man wearing the black sweatshirt begins firing a gun from the front passenger door towards the entrance of the Gas & Go. When he begins firing, there are two cars between him and the store. The driver also appears to reach out and over the car and begins firing his weapon. The blue Charger then begins to pull away but stops suddenly and the front passenger opens the door and looks towards the entrance of the store. A gun then sticks out of the rear passenger window and muzzle flashes can be seen coming from it. At that point, it appears that another volley of bullets comes from the blue Charger, shooting out the window of the vehicle next to it. Multiple muzzle flashes can be seen from the front and rear passenger windows of the blue Charger, which then speeds away. Seconds later, the man wearing the yellow jacket runs out of the store carrying a gun. He gets back into his car and drives away.

{¶ 5} Footage from inside the convenience store shows the man in the yellow jacket standing next to the counter with a gun hanging out of his pocket. He looks towards the front door and pulls out the gun. Bullets then start flying into the store and the clerk, the man in the yellow jacket, and a third person dive to the floor behind the counter and then out of the frame. More bullets can be seen flying into the store knocking merchandise off the shelves. After a few more seconds, the man in the yellow jacket leaves through the front door of the store.

3.

{¶ 6} Two people, T.K. and R.P., suffered gunshot wounds while in their cars from the rounds fired by the men in the blue Charger. Both survived. Four other victims were identified as being in the convenience store at the time; two were employees and two were customers. They were unharmed. None of the victims that were interviewed identified Hannah as one of the shooters.

{¶ 7} During the trial, the state introduced a video depicting the parking lot of the Moody Manor apartment complex on the evening of January 20, 2022, at around 6:00 - 7:00 p.m. In the video, the blue Charger can be seen pulling into the parking lot. Eventually four individuals get out of the car and flashes can be seen appearing to indicate that photographs are being taken in front of the apartments. The four individuals then walk down the sidewalk around one of the buildings. One of the individuals is wearing a blue jacket and is carrying what appears to be an assault rifle. Another individual is wearing red pants, a black sweatshirt, and a red hat, identical to the person seen later that night at the Gas & Go before the shooting. None of the four individuals are wearing light colored pants and a beige-colored sweatshirt similar to the other individual at the Gas & Go. The four individuals returned to the car and drove away.

{¶ 8} Social media photos posted on the night of January 20, 2022, show the man wearing the blue jacket holding the assault rifle next to another man wearing light colored pants and a black jacket while standing in front of the Moody Manor apartments. The man wearing the blue jacket was also wearing yellow, slide-on sandals. Similar yellow sandals were recovered from the area immediately surrounding the blue Charger after it

4.

was abandoned following a police chase from the shooting on the morning of January 21, 2022.

{¶ 9} Also found in the blue Charger were a number of items, including bullet casings for rifle ammunition, clothes, two cell phones, drink bottles, and some suspected ecstasy. The car was processed for fingerprints and DNA, but nothing came back identifying Hannah. DNA evidence was found, however, linking Chicha Harris and Christopher Jones to the blue Charger. Toledo Police Detective James Tucker testified that Harris was the individual seen in the social media photograph posted on January 20, 2022, wearing the blue jacket and the yellow sandals, and holding the assault rifle. Tucker also identified Jones as the individual in the red pants and black jacket seen in the Moody Manor surveillance video as well as the video of the shooting at the Gas & Go.

{¶ 10} As part of his investigation, Tucker began looking through Harris's social media history and came upon a picture of Harris and two other men. Harris was pointing a gun at the camera in the photograph and all three men were displaying what appeared to be gang signs with their hands. Tucker took note of the picture because one of the men was tall and slender and was wearing a beige-colored sweatshirt with a design on the front. Tucker identified that it was the same sweatshirt that was seen in the surveillance video from the Gas & Go. Tucker also remarked that the man in the video was tall and slender and wore his pants the same way as the man in Harris's social media photo. Tucker identified that person as Hannah. Additionally, he noted that Hannah was left-

5.

handed. Hannah himself later admitted in a police interview that he was the person in Harris's social media photo.

{¶ 11} Hannah's police interview was also played for the jury. In the interview, Hannah stated that he was acquainted with Chicha Harris, but denied having a close relationship with him or having any involvement in the events of January 21, 2022. Instead, Hannah told Tucker that he was with his girlfriend that night. Tucker made multiple attempts to contact the girlfriend using the numbers provided by Hannah but was unsuccessful. Later in the investigation, Tucker obtained a different number for the girlfriend and was able to make contact. The girlfriend agreed to meet Tucker at the police station for an interview but never appeared.

{¶ 12} During the interview with Hannah, Tucker brought up that the sweatshirt he was wearing in Harris's social media photo looked identical to the one that was worn by the tall, slender person in the surveillance video from the shooting. Hannah told Tucker that it was a custom graphic sweatshirt that he ordered or printed to sell. Hannah said that he sold over 100 of those sweatshirts. At trial, during Tucker's cross-examination, Tucker acknowledged that a portion of a fourth person's arm could be seen in Harris's social media photo, and that person was wearing a shirt that was similarly colored to Hannah's custom graphic sweatshirt.

{¶ 13} Following the state's presentation of the evidence, Hannah moved for an acquittal pursuant to Crim.R. 29, which the trial court denied. Hannah then rested

6.

without calling any witnesses. The case was submitted to the jury, which returned with a verdict of guilty on all counts.

{¶ 14} Prior to sentencing, Hannah moved the court for relief from registration on the Violent Offender Registry under R.C. 2903.42. At the sentencing hearing, Hannah expounded on the motion, arguing that he was not the principal offender because the majority of the shots were fired from the front passenger's seat and the driver's seat, while Hannah was alleged to be in the rear passenger's seat. Upon consideration of the parties' arguments, the trial court denied the motion, reasoning that the video clearly showed shots being fired from the rear of the blue Charger as it was leaving the gas station. Thus, the court stated that it "does not find by a preponderance of the evidence that the offender was not the principal offender. He was one of the principal offenders, one of three."

{¶ 15} The court then proceeded to merge the counts of felonious assault with their corresponding counts of attempted murder, with the state electing to proceed to sentencing on the counts of attempted murder. In total, the trial court ordered Hannah to serve an indefinite prison term of 38 to 43 years.

## II. Assignments of Error

{¶ 16} Hannah has timely appealed his judgment of conviction and presents three assignments of error for review:

1.  The trial court abused its discretion by denying Appellant's motion for acquittal pursuant to Crim.R. 29, because the convictions herein were not supported by sufficient evidence to submit to the jury.

2.  Appellant's convictions were not supported by the manifest weight of the evidence because the State of Ohio did not prove the identity of defendant/appellant beyond a reasonable doubt.

3.  The trial court abused its discretion when it found Appellant subject to the Violent Offender Registry.

### III. Analysis

### A. Sufficiency of the Evidence

{¶ 17} In his first assignment of error, Hannah argues that the trial court erred when it denied his Crim.R. 29 motion for acquittal. "The denial of a motion for acquittal under Crim.R. 29(A) 'is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence.'" *State v. Haynes*, 2020-Ohio-1049, ¶ 24 (6th Dist.), quoting *State v. Tenace*, 2006-Ohio-2417, ¶ 37. In reviewing the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus; *State v. Sproles*, 2023-Ohio-3403, ¶ 33 (6th Dist.).

8.

{¶ 18} Hannah argues that the evidence was insufficient to prove his identity as one of the shooters beyond a reasonable doubt; he does not contest that the evidence was insufficient to prove the elements of attempted murder or felonious assault. Specifically, he notes that no one at the scene identified him or even gave a physical description such as a tattoo, hair style, or facial feature. Further, none of the fingerprint or DNA evidence recovered from the blue Charger was linked to him. Finally, the only evidence that tied him to the crime was that a sweatshirt worn by one of the shooters appeared to be similar to one that he was wearing in a non-contemporaneous social media post; a sweatshirt design of which he stated he produced and sold over 100 copies.

{¶ 19} The state, on the other hand, argues that Hannah's identity was proven through his admission to wearing the sweatshirt in the social media photo that was then seen in the video of the shooting, the similarity of Hannah's build to the tall, thin build of the shooter, and the testimony that Hannah was left-handed and the shooter was seen using his phone with his left hand.

{¶ 20} Upon review of the evidence in the light most favorable to the prosecution, the evidence is sufficient to support Hannah's convictions. The jury was presented with evidence that Hannah was well-acquainted with Harris, who was the driver of the blue Charger and one of the shooters. Notably, in the photo of Hannah and Harris together, Harris is holding what appears to be an assault rifle and both are making the same sign with their hands. This, coupled with the fact that the man in the video had a similar build to Hannah and was wearing the same sweatshirt that Hannah was seen in while he was

9.

with Harris, albeit at a different time, is sufficient for a rational juror to conclude beyond a reasonable doubt that Hannah was one of the shooters.

{¶ 21} Accordingly, Hannah's convictions were not based on insufficient evidence and his first assignment of error is not well-taken.

### B. Manifest Weight

{¶ 22} In his second assignment of error, Hannah argues that his convictions are against the manifest weight of the evidence. "Insufficiency and manifest weight are distinct legal theories." *State v. Petitto*, 2024-Ohio-186, ¶ 30 (6th Dist.), quoting *State v. Fenderson*, 2022-Ohio-1973, ¶ 73 (6th Dist.). When reviewing a manifest weight claim, "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Lang*, 2011-Ohio-4215, ¶ 220, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*, quoting *Thompkins* at 387.

{¶ 23} Hannah makes two arguments under his manifest weight challenge. First, he raises the same purported deficiencies in the evidence as to identity that he asserted in his insufficiency argument, with the additional observation that in Harris's social media photo, a portion of another person's arm can be seen next to Hannah, and that other

person is wearing a shirt that is arguably similarly colored to Hannah's. Hannah posits that this other shirt, coupled with Hannah's statements that he sold hundreds of the same type of shirt, undermines the state's identification of Hannah based on the sweatshirt worn by the shooter.

{¶ 24} Upon review of the entire record, this is not the exceptional case in which the jury clearly lost its way and the evidence weighs heavily against the conviction. As noted above, Hannah knew Harris, was seen in a photograph with him displaying the same signs while Harris was holding an assault rifle, was seen wearing the same sweatshirt as the shooter in the surveillance video, and had a similar build to the shooter. Further, the jury was not presented with any alternative explanation for where Hannah was on the night of the shooting because despite Tucker's best efforts, he was unable to verify Hannah's purported alibi and Hannah did not present any evidence to establish the alibi himself. Finally, there is very little, if any, evidentiary value to the visibility of a portion of a person's elbow wearing a similarly colored shirt to Harris. It is much easier to believe that the shooter seen wearing the same sweatshirt as Hannah was, in fact, Hannah. His convictions, therefore, are not against the manifest weight of the evidence as it pertains to his identity.

{¶ 25} Alternatively, Hannah argues that his convictions are against the manifest weight of the evidence because he did not "purposely" or "knowingly" attempt to kill or injure any of the victims other than the man in the yellow jacket. To be convicted of attempted murder under R.C. 2903.02(A), the state must prove that Hannah attempted to

"purposely cause the death of another." To be convicted of felonious assault under R.C. 2903.11(A)(2), the state must prove that Hannah "knowingly . . . [c]ause[d] or attempt[ed] to cause physical harm to another . . . by means of a deadly weapon or dangerous ordnance." Hannah states that, at most, he acted recklessly towards the other victims.

{¶ 26} This case presents a textbook example of the doctrine of transferred intent, which is a "general principle which permits liability for any crime involving a *mens rea* of intent—be it arson, assault, theft, or trespass—where the actual object of the crime is not the intended object." *State v. Dean*, 2015-Ohio-4347, ¶ 142, quoting Dillon, *Transferred Intent: An Inquiry into the Nature of Criminal Culpability*, 1 Buff.Crim.L.Rev. 501, 504 (1988).

{¶ 27} Applied here, Hannah purposely attempted to kill or knowingly attempted to cause harm to the man wearing the yellow jacket when he fired his gun into the Gas & Go. While the man wearing the yellow jacket was the intended object of the crime, he along with the other five individuals were the actual objects of the crime with T.K. and R.P. being struck by the gunfire while in their cars and the other four being in Hannah's line of fire as he shot into the Gas & Go. *See Dean* at ¶ 147 (doctrine of transferred intent applied to the charges of attempted murder of four victims that were standing on the porch during a drive by shooting in one incident and to one victim that was seated in a car next to the target in a second incident). Therefore, Hannah's intent transferred to the

12.

other five victims of his crimes such that his convictions are not against the manifest weight of the evidence.

{¶ 28} Accordingly, Hannah's second assignment of error is not well-taken.

### C. Violent Offender Registry

{¶ 29} In his third and final assignment of error, Hannah argues that the trial court erred when it denied his motion for relief from registration on the Violent Offender Registry.

{¶ 30} R.C. 2903.41 through 2903.44, otherwise known as Sierah's Law, establishes a database for violent offenders. *State v. Hubbard*, 2021-Ohio-3710, ¶ 19. "Sierah's Law establishes a presumption that a violent offender must enroll in the database in person, reenroll annually in person, and provide notice of any change of address for ten years after the offender's initial enrollment." *Id.* at ¶ 22, citing R.C. 2903.42(A) and 2903.43(D)(1). R.C. 2903.42(A)(4) provides that an offender may rebut this presumption by filing a motion and proving to the court by a preponderance of the evidence that "the offender was not the principal offender in the commission of the offense that classifies the person a violent offender."

{¶ 31} A trial court's denial of a motion to be excused from enrolling in the violent offender database is reviewed for an abuse of discretion. *State v. Misch*, 2021-Ohio-756, ¶ 17 (6th Dist.). An abuse of discretion connotes that the trial court's attitude is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157, (1980); *State v. Whitfield*, 2024-Ohio-187, ¶ 10 (6th Dist.).

13.

{¶ 32} In support of his assignment of error, Hannah argues that he was not the principal offender because he was not the driver of the blue Charger and because the majority of the shots arguably came from the front seat. Here, however, the offenses of attempted murder were committed through Hannah's conduct in firing his gun from the rear seat of the car into the Gas & Go. Thus, although others were also firing, Hannah was the principal offender "in the commission of the offense that classifies the person a violent offender." R.C. 2903.42(A)(4).

{¶ 33} This case is similar to *State v. Morgan*, 2020-Ohio-3955 (9th Dist.), in which the Ninth District upheld the trial court's finding that Morgan did not rebut the presumption that he was the principal offender. In *Morgan*, a car of four teenagers drove to meet Morgan and another individual named Smith. *Id.* at ¶ 2. When Morgan and Smith approached the driver's side of the car with guns drawn, the driver of the car attempted to drive away, at which point Morgan and Smith fired shots into the car, hitting and killing one of the passengers. *Id.* For these actions, Morgan ultimately pleaded no contest to one count of murder. *Id.* at ¶ 5.

{¶ 34} Prior to sentencing, Morgan filed a motion to rebut the presumption that he should be classified as a violent offender, which the trial court denied. On appeal, the Ninth District held that the trial court did not err when it found that Morgan did not meet his burden to rebut the presumption. *Id.* at ¶ 41. It reasoned that the presentence investigation summary indicated that Morgan and Smith both had weapons and both shot at the vehicle, noting that witnesses reported hearing the sound of two different guns fire

14.

six or seven shots at the car. *Id.* Thus, the court concluded that the presentence investigation report demonstrated that Morgan was the principal offender. *Id.*

{¶ 35} Similarly, in this case Hannah was one of three individuals that fired into the Gas & Go. As shown in the surveillance video, multiple muzzle flashes can be seen coming from the back seat of the blue Charger where Hannah was sitting. The trial court did not abuse its discretion when it found that Hannah had not rebutted the presumption that he was the principal offender.

{¶ 36} Accordingly, Hannah's third assignment of error is not well-taken.

### IV. Conclusion

{¶ 37} For the foregoing reasons, the judgment of the Lucas County Court of Common Pleas is affirmed. Hannah is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.     _____

                                                  JUDGE

Gene A. Zmuda, J.    

_____

Charles E. Sulek, P.J.                                      JUDGE
CONCUR.

_____
                                              JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.